UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ARTURO C. BOLANOS,

                      Petitioner,

    v.

TIM GARRETT,[1] *et al.*,

                    Respondents.

Case No. 3:16-cv-00640-MMD-CSD

ORDER

## I.    SUMMARY

Petitioner Arturo C. Bolanos filed a counseled Second Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 28 ("Petition")). A Nevada jury convicted Bolanos of murder, three counts of attempted murder, and two counts of battery (each count enhanced by use of a deadly weapon), and he was sentenced to an aggregate of 45 years and one month to life imprisonment. (ECF Nos. 50-2, 50-9.) This matter is before the Court for adjudication on the merits of the Petition. The Court denies the Petition and grants a Certificate of Appealability ("COA").

## II.    BACKGROUND[2]

On October 2, 2011, at around 3:15 a.m., shots were fired in the Jones Vargas parking garage ("garage") near Freight House District ("FHD") and Aces ballpark in Reno.

---

[1]The state corrections department's inmate locator page indicates Bolanos is incarcerated at Lovelock Correctional Center ("LCC"). *See* NDOC Inmate Search. Nethanjah Breitenbach is the warden of that facility. *See* Lovelock Correctional Center Facility | Nevada Department of Corrections. The Court directs the Clerk of Court to substitute Nethanjah Breitenbach for Respondent Tim Garrett under Fed. R. Civ. P. 25(d).

[2]The Court summarizes the relevant state-court record solely as background for consideration of the issues in this case. The Court makes no credibility or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by the Court. Failure to mention a specific piece of evidence or category of evidence does not signify the Court overlooked it in considering the issues.

Earlier, "Bolanos's group" parked three vehicles on the first parking level:

(1)    Bolanos drove a red BMW with Cousin John Bolanos as passenger;[3]

(2)    Mariela Bolanos (Bolanos's sister) drove a silver Lexus with her fiancé Jose Aguilar and Erasmo Cosio as passengers; and

(3)    Gustavo Bolanos (Bolanos's brother) drove a black Mercedes with cousin J.S. as passenger[4]

(ECF No. 42-1 at 6-8, 22-23, 26-27, 30-33.)

A group of witnesses, "Villagrana's group," parked two vehicles on the same level:

(1)    A blue BMW occupied by Diego Villagrana and Paola Carrillo; and

(2)    A white Lexus occupied by Osvaldo Carrillo (Paola Carrillo's brother), Cynthia Veilman (the Carrillos' cousin), and three others.

(ECF No. 46-1 at 8-10, 61, 93.)

The victims, "Lopez's group" (Anthony Lopez, Enrique Montanez, Macorio Ortiz, and Samuel Villa), parked a brown Chevy Tahoe on a higher level than the other groups. (ECF No. 42-1 at 299-04.) A fourth group, driven in a white Cadillac by Adrian Montanez, parked in a flat parking lot next to FHD. (ECF No. 49-2 at 12-14.)

### A.    The Prosecution's Case

#### 1.    Summary of the Sequence of Events

There was no surveillance video inside the garage. (ECF No. 48-1 at 130.) Based on the investigation and video from FHD, Reno Police Department ("RPD"), and Aces ballpark, RPD Officer David Millsap narrated the overall sequence of events. He said the

---

[3]Many of the parties involved in this case have the same last names. Petitioner will be referred to as "Bolanos." Witness Paola Carrillo will be referred to by her maiden name, "Carrillo." Victim Enrique Montanez will be referred to as "Montanez." For clarity, the Court will refer to John Bolanos, Gustavo Bolanos, Mariela Bolanos, Marcela Bolanos, Osvaldo Carrillo, and Adrian Montanez by their first names. Last names will be used for individuals not sharing the last names Bolanos, Carrillo, and Montanez.

[4]The Local Rules of Practice state: "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court, including exhibits, whether filed electronically or in paper, unless the court orders otherwise." LR IA 6-1. The rule directs that only the initials of minors should be used. *Id.* "J.S." was a minor at the time of the offenses.

video depicts security broke up a verbal altercation between J.S. and Lopez outside FHD and then Lopez's group went to the garage. (*Id.* at 80-83.) Villagrana's group walked toward the garage. (*Id.* at 85-87.) Bolanos left the bar and had a conversation outside with John and Cosio. (*Id.* at 84-85.) Bolanos next conversed with Gustavo and J.S., and they proceeded to the garage. (*Id.* at 85-88.) John and Jimenez walked toward the garage until shots were fired, at which point they ran for cover, and John ran into the garage. (*Id.* at 90-92.) Soon after, Lopez and Bolanos, followed by Gustavo and John, and "possibly J.S." ran out of the garage. (*Id.* at 94-96.) Bolanos and Lopez fought. (*Id.*) Two individuals ran across the bridge on East 2nd Street. (*Id.* at 97.) Millsap concluded, based on his investigation, the first runner was Bolanos and the second was possibly J.S. (*Id.* at 102-03.) He agreed, however, that due to poor video quality, Bolanos could have instead been the second runner. (*Id.* at 106.) Millsap stated the video shows Mariela's Lexus exited the garage and Gustavo, Cosio, and Jimenez entered her vehicle. (*Id.*) Millsap could not account for when J.S. entered the Lexus as there was a gap in surveillance, suggesting J.S. possibly entered the Lexus between Mariela's right turn onto East 2nd Street and her subsequent stop to interact with Bolanos on East 2nd Street in front of RPD (depicted on surveillance video). (*Id.* at 104-05.) Villagrana's blue BMW and Osvaldo's white Lexus exited the garage and followed the Lexus onto East 2nd Street. (*Id.* at 97-98.) John exited the garage in the red BMW and went elsewhere. (*Id.*) Lopez went to FHD. (*Id.*)

### 2.    J.S. made a gang-related remark during argument with Lopez.

Lopez testified that around 3:00 a.m., he went outside FHD, saw Gustavo, and they shook hands. (ECF No. 44-1 at 161-63.) Lopez claimed he was previously associated with the 18th Street gang and wore a tattoo of an "18" and three dots under his lower lip. (*Id.* at 148-49.) Lopez believed Gustavo claimed Norteño affiliation. (ECF No. 44-1 at 151-52.) Lopez said he "had a beef" with Gustavo about "colors," a year earlier but they quashed it. (*Id.* at 147-54.) Lopez had told Gustavo "I don't do that stuff anymore;" and Gustavo had replied, "Yeah. We'll just keep it cool, then." (*Id.*) Lopez was with Montanez, who had a three-dot tattoo and was associated with Carson City Eastwood

1    Tokers gang, and Villa, who claimed he no longer associated with the 18th Street gang

2    because he started a family. (ECF Nos. 42-1 at 309-11, 43-1 at 50-51.)

3         Veilman testified she joined Gustavo and J.S. outside FHD, and that J.S. "started"

4    an argument with Lopez and told Lopez, "This is Norte." (ECF No. 45-2 at 241, 245-47,

5    250-51, 255.) Veilman knew the remark was gang-related due to her experience living in

6    Carson City where there are a lot of small gangs. (*Id.* at 239, 241-47.) She knew Lopez

7    from high school and that he was associated with 18th Street gang. (*Id.*) When security

8    broke it up, Lopez's group went to the garage. (ECF Nos. 42-1 at 312, 43-1 at 62-63.)

9    Veilman later saw Bolanos and Aguilar pick up rocks, and along with J.S. and Gustavo,

10   run into the garage. (ECF No. 45-2 at 256-58.) Carrillo testified she recalled seeing

11   Mariella outside FHD and that Mariella told Veilman or Lugo that 18th Street was starting

12   "crap" with her brother. (ECF No. 46-1 at 183-84, 191-93.)

13        **3.    Shots were fired at Lopez's group, and he crashed in the garage.**

14        Lopez drove his group in the brown Chevy Tahoe toward the garage exit when two

15   men, whom he did not know, pointed a laser at his vehicle. (ECF No. 44-1 at 170-78.)

16   Villa saw an unidentified man beside a red Honda Accord point a black rifle with a laser

17   red dot at their vehicle. (ECF Nos. 42-1 at 315-17, 43-1 at 10-11, 30, 39.) Montanez saw

18   a female and two males who were about five feet tall,[5] and one of the men wore black

19   and had a black gun with a red "laser beam" on it. (ECF No. 43-1 at 66-67, 87-88.)

20        Lopez sped up, heard gunfire, and crashed the vehicle. (ECF No. 44-1 at 173-77.)

21   Villagrana was heading toward his vehicle, heard gunfire, saw the crash, and saw

22   Bolanos follow the Tahoe while reloading or cocking a long rifle, although he did not see

23   him shoot. (ECF No. 46-1 at 82-85, 96.) Carrillo was with Villagrana and saw Bolanos

24   shoot a black gun and follow the vehicle down the ramp. (*Id.* at 207-13, 236-39, 250-51.)

25   Lopez testified he jumped out of the truck, ran down the garage ramp, Gustavo and

26   Bolanos attacked him, and Bolanos hit him with a rifle. (ECF No. 44-1 at 178-85, 190-91.)

27   ───────────────

28        [5]In closing argument at trial, the State argued: "If you notice, Arturo Bolanos, he's six-foot-one, 215 pounds. He's a big guy. Much bigger than J.S." (ECF No. 49-2 at 93.)

1    John testified he got into a fight at the bottom of the ramp with an unknown male.

2    (ECF No. 45-2 at 110-120.) He claimed Bolanos joined the fight but was not holding a

3    rifle, and eventually let the man go, gave John the key to the red BMW, and presumably

4    went to look for Mariela. (*Id.* at 124-25, 143-45.) When John reached the red BMW, the

5    trunk was slightly open, and he assumed he unintentionally opened it using the remote

6    control on the key fob. (*Id.* at 127, 152.) John claimed he was unaware the trunk contained

7    ammunition and an empty rifle case. (*Id.* at 128-29.)

8    Lopez was shot in the leg; Villa's eye was injured in the crash; and Montanez's

9    neck was broken, and wrist cut. (ECF Nos. 43-1 at 17, 72-74, 44-1 at 187.) Ortiz died

10    from a penetrating gunshot wound to his back. (ECF Nos. 41-1 at 93-96, 46-1 at 173-76.)

11    No victim identified the shooter. (ECF Nos. 41-1 at 101, 43-1 at 39, 41, 93-94.)

12    **4.    Bolanos ran away and vehicles departed.**

13    FHD manager John Scott heard the gunfire and called 911. (ECF No. 41-1 at 145.)

14    He said surveillance video captured his observation of two men in dark clothing leaving

15    the garage and heading down East 2nd Street toward the bridge over the Truckee River:

16    the first carrying a gun with a laser, and the second with no weapon. (*Id.* at 147-50, 194.)

17    Mariela drove the silver Lexus out of the garage, with Aguilar as passenger; she

18    claimed Gustavo, Cosio, and Zuleika Jimenez jumped into the backseat. (ECF No. 42-1

19    at 71-73, 157-58.) Mariela claimed J.S. jumped into the backseat at the same time as the

20    others. (*Id.*) Mariela then turned right onto East 2nd Street, drove onto the bridge spanning

21    the Truckee River, and spotted Bolanos, whom she did not realize was in front of RPD.

22    (*Id.* at 73-76.) Gustavo rolled down the back passenger window and called out to Bolanos

23    to get inside the Lexus, but Bolanos appeared confused, did not recognize them, and

24    refused to get inside the car. (*Id.* at 76-78.) Mariela and Aguilar denied Bolanos placed

25    anything, including a gun, inside the Lexus. (*Id.* at 76-77, 160.)

26    At trial, Jimenez testified she consistently told police Bolanos did not have a gun

27    and at trial denied Bolanos placed a gun in the Lexus. (ECF No. 44-1 at 313.) She claimed

28    she lied when she told the prosecutor (1) a "big gun" bumped her leg in the car; (2) she

heard Cosio say, "Wipe it down"; (3) she saw J.S. wipe down a gun; (4) Mariela stopped in a parking lot between the stop in front of RPD and when police stopped them; and (5) she saw J.S. exit the vehicle and throw a gun. (*Id.* at 303-06, 308-10, 313.) She claimed she told the truth at trial, because, unlike her conversation with the prosecutor, it was a felony to lie on the witness stand. (*Id.* at 303-05, 312.) Cosio denied a rifle was in the Lexus, that he said anything about wiping fingerprints from a rifle, or that a rifle was thrown from the vehicle. (*Id.* at 255-56, 262, 274-75.)

### 5.    Police stopped Bolanos, the Silver Lexus, and the red BMW.

RPD Officer Hakin responded to the 911 call by going outside RPD where he saw only Bolanos, with nothing in his hands, walking on East 2nd Street. (*Id.* at 197-201, 226, 242.) Hakin saw a silver vehicle stop, interact with Bolanos on the passenger side, and leave without him. (*Id.* at 202-05.) A blue vehicle stopped Hakin, and based on information from its occupants, he detained Bolanos, whose head was bleeding, and claimed he jumped and did not know the Lexus's occupants. (*Id.* at 206-08, 212-13, 239.)

Officer Coffey was alerted that witnesses stated a silver sedan with potentially armed occupants might be involved in the shooting. (ECF No. 42-1 at 250-59.) Coffey spotted Mariela driving the Lexus, which matched the description, and stopped her near Mill and Locust Streets. (*Id.*) While following her, Coffey did not see anything thrown from the Lexus. (*Id.*) Meanwhile, police stopped John in the red BMW. (*Id.* at 284-90.)

RPD Detective John Ferguson interviewed Bolanos that morning. (ECF No. 48-1 at 161.) Bolanos told Ferguson a friend dropped him off near FHD. (*Id.* at 181, 183-84.) Bolanos said he left FHD, was hit in the head, knocked to the ground, saw an unknown Hispanic male followed by several other Hispanic males, ran away, and something hit his leg. (*Id.* at 178-79.) Bolanos told Ferguson he did not recognize the vehicle or occupants who stopped him and that several hands tried to pull him into the vehicle. (*Id.* at 180-81.)

### 6.    Firearm and DNA Evidence

Bolanos's jeans had Lopez's blood on the front thigh. (ECF No. 45-2 at 195-96, 207-08, 228.) Bolanos's cellphone contained photographs, taken July 31, 2011, depicting

1  an AR-15 rifle with a scope, and possibly an infrared laser emitter, but the caliber was

2  indeterminable. (*Id.* at 79-80, 83-89, 91-92, 98-101.)

3  The red BMW contained no weapon, but police found, among other things, a rifle

4  case, live .223 caliber ammunition, and a magazine containing .223 cartridges. (ECF No.

5  44-1 at 66-68, 70-75.) No fingerprints were on the magazine and .223 caliber cartridges

6  inside it. (*Id.* at 77-79, 81-82.) No one searched other items in the rifle case for prints. (*Id.*

7  at 82-100.) There was insufficient DNA on the magazine. (ECF No. 45-2 at 212.)

8  The Lexus contained a magazine clip for .308 caliber bullets, a live .223 rifle

9  cartridge in the spare tire compartment, a rifle projectile, and an empty ammunition box.

10  (ECF Nos. 43-1 at 220-21, 44-1 at 25-29.) A black shirt and gray shirt were collected from

11  the backseat. (ECF No. 43-1 at 222-24.) Only Bolanos's blood was on the shirts. (ECF

12  No. 45-2 at 197-200.)

13  An AR-15 semi-automatic rifle typically shoots .223 caliber ammunition but can

14  shoot other calibers. (ECF No. 43-1 at 105-06, 129.) Twelve .223 caliber cartridge casings

15  found at the garage were fired from the same gun. (*Id.* at 123, 127.) An unfired .223

16  cartridge at the scene was the same brand as the spent cartridges but could not be

17  directly associated with them. (*Id.* at 130-34, 161-62.) One bullet fragment was consistent

18  with a .223-caliber fired-bullet. (*Id.* at 136-37.) No latent fingerprints were found on the 12

19  shell casings or live round collected at the garage. (ECF No. 44-1 at 29-30.) There was

20  no DNA on the spent cartridges. (ECF No. 45-2 at 212.)

21  On the morning of the shooting, convicted felon David Hudson found near Mill

22  Street, an AR-15 rifle with bipod, scopes, and laser. (*Id.* at 10-11, 17-19.) He traded the

23  firearm for methamphetamine. (*Id.* at 28.) Familiar with firearms, he told Detective

24  Ferguson the rifle had four .223 caliber rounds in the magazine and none in the chamber.

25  (*Id.* at 18-22, 45, 58-59.) He provided a drawing of the gun. (*Id.* at 35-36, 59-60, 65-66.)

26  **7.    Bolanos was apprehended in California.**

27  On October 12, 2011, Shasta County Sheriff's Sergeant John Patrick Kropholler

28  stopped Bolanos in California. (ECF No. 45-2 at 149-55.) Bolanos gave a fake name, but

1  eventually admitted his true name and that he was wanted for murder. (*Id.*) Bolanos had

2  dyed over a gray spot in his hair and grew a longer beard. (ECF No. 48-1 at 53-55.)

3  ### 8. Gang Expert Testimony

4      Chad Crow was on assignment with the FBI's Safe Street Gang Task Force in

5  Reno, Nevada, and had served for eight years on the Regional Gang Unit at RPD. (ECF

6  No. 46-1 at 260-67.) He utilized a federal database, Gang NET, to share gang-related

7  information, including gang membership that was validated by either self-admission or

8  law enforcement observation of tattoos, clothing, associates, or informants. (*Id.*) Crow

9  explained that "Norte" or "Northerner" can mean "Norteño" and "Sureño" means

10  "Southerner." (ECF Nos. 46-1 at 279; 48-1 at 7.)

11      Crow opined Bolanos was a Kings Beach Norteño based on: (1) a Gang NET

12  database entry (allegedly supported by a 2009 field interview); (2) Bolanos's tattoos of

13  Huelga bird and "GUN"; and (3) Bolanos's jail classification for housing. (ECF No. 46-1 at

14  284-86.) He said that "GUN," is an acronym for "Generation of United Norteños" calling

15  Norteños to unite against Sureños. (*Id.* at 286-87.) Crow opined the following

16  circumstances surrounding the shootings presented a motive for murder: (1) Lopez and

17  J.S. had a verbal altercation where J.S. stated, "This is Norte"; and (2) Lopez was an

18  admitted Sureño gang member accompanied by Sureños. (*Id.* at 291-92.) Crow explained

19  gang members are expected to "get involved" and "all fight" and "if they're also family,

20  everything just gets heightened." (*Id.* at 293.)

21      Crow admitted he mistakenly opined Bolanos was a self-admitted Norteño based

22  on a field interview of Gustavo but claimed he merely forwarded the wrong email. (ECF

23  No. 48-1 at 8-13, 20-21.) He testified he confirmed the Gang NET database entry stated

24  Bolanos was a self-admitted Norteño gang member. (*Id.* at 21-22.) He admitted a Huelga

25  bird does not necessarily mean Bolanos is a Norteño as it is an Aztec symbol and a

26  mascot for Cesar Chavez's United Farm Workers. (*Id.* at 17-19.) Crow said Bolanos was

27  housed with Norteños at the jail and agreed Bolanos had reported to the jail that he was

28  affiliated with Kings Beach Norteños when he was 12 to 13 years old until he moved away

1    at 16. (*Id.* at 22-24, 29-32.) He said the circumstances here were not a typical gang hit-

2    up. (*Id.* at 13-16.)

3         **B.    The Defense Case**

4         FHD Director of security, Mike McFarland, saw "two large groups of males," "got

5    into it" inside the FHD early that night, and were asked to leave when they later "got into

6    it again." (ECF No. 49-1 at 5, 13-14.) Outside, a group McFarland associated with Lopez

7    was the "more aggressive group." (*Id.* at 13-15, 17, 19-23, 91.) The groups appeared to

8    want to fight; FHD security told them to leave; and one group went to a white Cadillac in

9    a "flat, open parking lot." (*Id.* at 14-17, 31-32, 53, 92-93.)

10        McFarland described a smaller third group, that included Gustavo and J.S., who

11   was "not part of the big problem" with the two larger groups. (*Id.* at 14, 23-24.) The third

12   group had "words back and forth" with one of the larger groups but McFarland thought it

13   was "nothing serious," and the larger group left for the garage. (*Id.* at 17-18, 55-56.) The

14   smaller group "got into it" with another small group but dispersed when McFarland

15   signaled them to leave. (*Id.* at 38.) He did not see Bolanos in the groups. (*Id.* at 21.)

16        McFarland was suspicious when he saw the white Cadillac go into the garage and

17   then a second white vehicle stop at the garage, turn on hazard lights, and drop off a group

18   of males who ran into the garage, as "it seemed like they were out to do something." (*Id.*

19   at 19-20, 32-33.) Believing "something was going to happen" and concerned about safety,

20   McFarland "told everybody, 'Don't go over there'" to the garage. (*Id.* at 19, 23, 51, 53.)

21        McFarland heard gunfire and subsequently saw two people run out of the garage.

22   (*Id.* at 28.) The first wore all black. (*Id.* at 25-26, 34-37.) The second wore a dark "tank

23   top or a t-shirt." (*Id.*) He directed FHD security guard Tycho Robertson to watch the

24   runners as they ran down East 2nd Street over the bridge toward RPD. (*Id.* at 28-29.)

25        Robertson testified he narrated his observations to the 911 operator, i.e., "two guys

26   come out, and they start running over the bridge"; the front runner was "dressed in 'all-

27   black'" and pumped his arms with what Robertson believed was a weapon with a "laser

28   sight of some kind" because as he pumped his arms Robertson saw "red, red, red." (ECF

No. 47-1 at 16-18, 31-32.) Robertson reported the second man was larger than the first man and wore a black tank top and slightly lighter colored pants. (*Id.* at 17, 32.) Robertson confirmed his observations are depicted in surveillance video played for the jury, although he agreed the video was poor quality. (*Id.* at 29-31.) Robertson lost sight of the first runner after the runner crested the bridge; however, anticipating the first runner would reach the other side of the bridge in front of RPD, he alerted the operator that police might intercept the runner. (*Id.* at 18-19, 32.) Robertson was aware there was a field to the right of the runners after they crossed the bridge. (*Id.* at 19-20.) Robertson was positive the second runner wore a black tank top, did not have a weapon, and contacted a vehicle stopped on the bridge. (*Id.* at 18.)

### C.  Prosecution's Rebuttal Evidence

Adrian Montanez and three others went to FHD in a white Cadillac and parked in an empty lot right next to FHD. (ECF No. 49-2 at 12-13, 22.) Adrian claimed he was not a gang member and, to his knowledge, neither were his companions. (*Id.* at 34-35.) At closing time, they retrieved the Cadillac and went to the garage to meet his brother (Montanez), brother-in-law (Villa), and friend (Ortiz), who were part of Lopez's group. (*Id.* at 14-17.) Lopez's group left first, and Adrian heard gunfire. (*Id.*) He did not see the events leading to the crash and denied anyone in his group had problems with anyone in Lopez's group. (*Id.* at 18-20.) After the crash, he went to the hospital and then gave a statement to Detective Ferguson. (*Id.*) He denied knowing anything about a group who pulled in front of the garage and ran inside it. (*Id.* at 28-29.)

## III.  LEGAL STANDARD

### A.  Review under the Antiterrorism and Effective Death Penalty Act

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in *habeas corpus* cases under the Antiterrorism and Effective Death Penalty Act (AEDPA):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

1

2
　　　　(1)　　resulted in a decision that was contrary to, or involved
3
an unreasonable application of, clearly established Federal
law, as determined by the Supreme Court of the United
States; or

4
　　　　(2)　　resulted in a decision that was based on an
5
unreasonable determination of the facts in light of the
evidence presented in the State court proceeding.
6

7    28 U.S.C. § 2254(d). A state court decision is contrary to established Supreme Court

8    precedent, within the meaning of § 2254(d)(1), "if the state court applies a rule that

9    contradicts the governing law set forth in [Supreme Court] cases" or "if the state court

10   confronts a set of facts that are materially indistinguishable from a decision of [the

11   Supreme] Court and nevertheless arrives at a result different from [Supreme Court]

12   precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529

13   U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court

14   decision is an unreasonable application of established Supreme Court precedent under

15   § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the

16   Supreme] Court's decisions but unreasonably applies that principle to the facts of the

17   prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable

18   application' clause requires the state court decision to be more than incorrect or

19   erroneous. The state court's application of clearly established law must be objectively

20   unreasonable." *Id.* (internal citation omitted) (quoting *Williams*, 529 U.S. at 409-10).

21   　　　　The Supreme Court has instructed that a "state court's determination that a claim

22   lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'

23   on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101

24   (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court

25   has stated that "even a strong case for relief does not mean the state court's contrary

26   conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75). *See also Cullen*

27   *v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted)

28   (describing the standard as a "difficult to meet" and "highly deferential standard for

1    evaluating state-court rulings, which demands that state-court decisions be given the

2    benefit of the doubt"). To obtain habeas relief, a prisoner must show that the state court's

3    ruling on the claim presented was "so lacking in justification that there was an error well

4    understood and comprehended in existing law beyond any possibility for fairminded

5    disagreement." *Harrington*, 562 U.S. at 103.

6    **B.    Standards for Evaluating Ineffective Assistance of Counsel ("IAC")**

7    An IAC claim requires a petitioner demonstrate: (1) the attorney's "representation

8    fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient

9    performance prejudiced the petitioner such that "there is a reasonable probability that, but

10   for counsel's unprofessional errors, the result of the proceeding would have been

11   different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "Unless a

12   [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from

13   a breakdown in the adversary process that renders the result unreliable." *Id.*

14   A petitioner who makes an IAC claim "must identify the acts or omissions of

15   counsel that are alleged not to have been the result of reasonable professional judgment."

16   *Strickland*, 466 U.S. at 690. A court considering an IAC claim, "must indulge a strong

17   presumption that counsel's conduct falls within the wide range of reasonable professional

18   assistance; that is, the defendant must overcome the presumption that, under the

19   circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at

20   689. Thus, when considering IAC claims, a court is obliged to "determine whether, in light

21   of all the circumstances, the identified acts or omissions were outside the wide range of

22   professionally competent assistance." *Id.* at 690. "In making that determination, the court

23   should keep in mind that counsel's function, as elaborated in prevailing professional

24   norms, is to make the adversarial testing process work in the particular case," and

25   "counsel is strongly presumed to have rendered adequate assistance and made all

26   significant decisions in the exercise of reasonable professional judgment." *Id.*

27   "A fair assessment of attorney performance requires that every effort be made to

28   eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Id.* at 690. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91.

In establishing there is a reasonable probability the result of the trial would have been different, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112; *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011). A petitioner must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687-88. The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions. *See Harrington*, 562 U.S. at 104.

To prevail on an ineffective assistance of appellate counsel claim, a petitioner must show his appellate counsel acted deficiently and "a reasonable probability that, but for his [appellate] counsel's" deficiency, Petitioner "would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285 (2000). When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap. *See, e.g., Bailey v. Newland*, 263 F.3d 1022, 1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989). Effective appellate advocacy requires weeding out weaker issues with less likelihood of success. The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason—because the omitted issue has little or no likelihood of success on appeal. *See id.*

///

13

1    In *Harrington*, the Supreme Court clarified that *Strickland* and § 2254(d) are each

2  highly deferential, and when the two apply in tandem, review is doubly so. *See Harrington*,

3  562 U.S. at 104-05. *See also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010)

4  (internal quotation marks omitted). The Court further clarified, "[w]hen § 2254(d) applies,

5  the question is not whether counsel's actions were reasonable. The question is whether

6  there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."

7  *Harrington*, 562 U.S. at 105.

8  **IV.    DISCUSSION**

9      **A.    Ground 1—Admission of gang-affiliation evidence**

10    Bolanos alleges the trial court admitted prior-bad-act-evidence of: (1) Bolanos's

11  tattoos as evidence of Norteño gang affiliation; and (2) gang-expert testimony, in violation

12  of his rights to due process and a fair trial under the Fifth, Sixth and Fourteenth

13  Amendments. (ECF No. 28 at 10-13.) Respondents contend Bolanos fails to establish the

14  Nevada Supreme Court's ("NSC") application of state evidentiary law violated his federal

15  constitutional rights to due process and a fair trial, or that the error, if any, had substantial

16  and injurious effect or influence in determining the jury's verdict. (ECF No. 72 at 12-17.)

17      **1.    Additional Background**

18    The State filed a notice of intent to introduce evidence of Bolanos's gang affiliation

19  to establish motive to commit the crimes. (ECF No. 35-9.) The State argued a motive for

20  the shooting was established based on Bolanos's Norteño affiliation, the victims' Sureño

21  affiliation, the argument outside FHD, and an alleged text message from Gustavo stating,

22  "Come down 18th street."[6] (*Id.* at 4-5.) The State argued the State's expert testimony

23  would provide evidence of the history, symbols, and rivalry of the Norteño and Sureño

24  gangs and that Bolanos's tattoos were clear and convincing evidence of his Norteño

25  affiliation. (*Id.* at 4-7.) Bolanos opposed, arguing, among other things, there was no clear

26  and convincing evidence that Bolanos was a Norteño or that he and the victims were rival

27

28
_____

[6]The Court found no evidence in the trial record of that alleged text message.

gang members, and that such evidence was more prejudicial than probative. (ECF No. 35-13.) Bolanos also filed a motion to preclude the State from presenting gang-expert testimony. (ECF No. 35-12.)

At the hearing on the motions, the State made an offer of proof through Crow's testimony. (ECF Nos. 39-1 at 171, 39-2.) Crow testified about his experience as an RPD officer focusing on gangs. (ECF No. 39-2 at 4-7.) He explained that he typically investigated Norteño and Sureño gang memberships in Washoe County and was familiar with Norteño and Sureño gangs in Northern Nevada, including Carson City, and the Kings Beach Norteños in Lake Tahoe. (*Id.* at 7, 13-15.) He testified Bolanos was housed with Norteños at the jail and, according to a Gang NET entry, self-admitted as a Kings Beach Norteño in 2009. (*Id.* at 21.) Crow testified Bolanos's Huelga bird and GUN tattoos were associated with Norteño gang membership. (*Id.* at 21-22.) He opined a rival gang fight would be consistent with circumstances where one individual has a three-dot tattoo on his face and "18" tattooed on his chest, and the other individual has a Huelga bird tattoo. (*Id.* at 24.) Crow admitted he is not a gang officer in Carson City and that tattoos, alone, are insufficient to validate an individual as a gang member as more than one criterion must be met. (*Id.* at 28, 31-32.)

The State argued there is no reasonable explanation for the shooting without the gang evidence to establish motive. (ECF No. 39-1 at 176.) The State argued it established clear and convincing evidence of Bolanos's gang affiliation and the expert's testimony was relevant to the crimes. (*Id.* at 175-77.) The State requested a preliminary ruling admitting the evidence, subject to the State laying a foundation at trial and providing a limiting instruction informing the jury precisely why it could consider the gang evidence and that it could not use it to determine Bolanos is a "bad guy." (*Id.*)

The defense argued there is no evidence the shooting had anything to do with gang rivalry, Bolanos was not present during the verbal altercation; and there was neither evidence Bolanos received a text saying "18th Street, Come Down" nor surveillance video showing him respond to a text. (*Id.* at 177-82.) The defense argued the Huelga bird and

15

GUN tattoos had other meanings, the Gang NET entry failed to establish Bolanos was a gang member, and the State failed to prove Bolanos was ever charged with gang activity or gang violence or was an active gang member at the time of the incident. (*Id.*)

The trial court preliminarily ruled, subject to the evidence at trial, and based on the "18 Street" text, that evidence of Bolanos's affiliation with the Norteño gang was relevant to motive, and the State's expert testimony was admissible to assist the jury:

> THE COURT: [S]ubject to the evidence actually coming in, this will be a preliminary ruling. I do find that it's relevant.
>
> The "18th Street" comment provides some evidence of motive. If the evidence is presented and is clear—it's found to be clear and convincing, it suggests that that probative value of that evidence is not substantially outweighed by the danger of unfair prejudice.
>
> I would note also that Detective Crow, who has testified—a person who has specialized knowledge, training and experience in this area—that given the unique set of circumstances, that much of this testimony would be outside the purview of ordinary jurors, and, therefore, his testimony would assist the trier of fact. So certainly, you have to make good on your offer of proof. So that will be the preliminary ruling.

(*Id.* at 182-83.)

Before jury selection, the State confirmed it would provide the defense with a field interview supporting the Gang NET entry that Bolanos self-identified as a Norteño. (ECF No. 41-1 at 32.) Before Crow's trial testimony, defense counsel reiterated the objection to Crow's testimony, but agreed, if the evidence was admissible, a cautionary instruction was appropriate. (ECF No. 46-1 at 256-57.) Before Crow's testimony, the trial court read the cautionary instruction:

> THE COURT: Ladies and gentlemen, at this time, you're going to hear some testimony that consists of some evidence of other crimes, wrongs or acts that relate to gang membership or affiliation of Mr. Bolanos.
>
> That information is not admissible to prove the character of Mr. Bolanos in order to show that he acted in conformity with that character, and it is not to be considered by you for that purpose.
>
> However, it may be considered for you—I'm sorry—by you for another purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. That is the only purpose for which you may consider that information.

1    (*Id.* at 259.)

2    At trial, Crow admitted he mistakenly used Gustavo's field interview as supporting

3    documentation for the Gang NET entry that states Bolanos is a self-admitted Norteño.

4    (ECF No. 48-1 at 8-13.) He claimed he merely forwarded the wrong email and had

5    confirmed "in the database" that Bolanos was a self-admitted Norteño gang member; the

6    State, however, did not produce a field interview supporting the Gang NET entry. (*Id.* at

7    13, 21-22, 29.) Crow agreed Bolanos's jail classification documentation reflects Norteño

8    affiliation when he was 12 and 13 years old until he was 16 and moved away and that

9    people can get out of gangs by moving away. (*Id.* at 31-32.) The State argued gang rivalry

10   motivated the crimes. (ECF No. 49-2 at 78, 85-87, 94, 99.)

11   ## 2.    Applicable Legal Standards[7]

12   "[I]t is not the province of a federal habeas court to reexamine state-court

13   determinations on state-law questions. In conducting habeas review, a federal court is

14   limited to deciding whether a conviction violated the Constitution, laws, or treaties of the

15   United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Under 28 U.S.C. § 2254(a),

16

17   ───────────────

[7]In Nevada, "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." NRS § 48.045(2). An "act" as written in NRS § 48.045(2) and (3) "is broad enough to encompass gang affiliation as a continuous act." *Butler v. State*, 102 P.3d 71, 79 n.9 (Nev. 2004). A "presumption of inadmissibility attaches to all prior bad act evidence." *Rosky v. State*, 111 P.3d 690, 697 (Nev. 2005). To overcome the presumption, the prosecutor must request a hearing and establish: (1) the prior bad act is relevant to the crime charged; (2) the act is proven by clear and convincing evidence; and (3) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See id.* Prior bad act evidence may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *See, e.g.*, *Butler,* 102 P.3d 71, 78-79 (holding evidence of defendant's gang affiliation admissible under statute governing admission of evidence of other crimes, wrongs, or acts; evidence was relevant to show defendant's motive, provided common thread that connected story of events, its probative value outweighed its prejudicial effect, and trial court gave appropriate cautionary instruction to jury on use of evidence before deliberations); *Lay v. State*, 886 P.2d 448, 452 (1994) (holding evidence that defendant was gang member admissible as tending to show motive for shooting rival gang member). *See also, e.g.*, *Gonzalez v. State*, 366 P.3d 680, 687 (2015) (reaffirming the use of gang evidence to prove motive) (citing *Butler*, 102 P.3d at 78 ("This court has repeatedly held that gang-affiliation evidence may be relevant and probative when it is admitted to prove motive.")).

the correctness of a state trial court's evidentiary ruling as a matter of state law "is irrelevant to [federal habeas] review, because a federal court may entertain an application for a writ of habeas corpus 'only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States.'"). *Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir. 2008) (citing 28 U.S.C. § 2254(a)).

A state court's erroneous evidentiary ruling is grounds for federal habeas relief only if it is so fundamentally unfair as to violate due process. *See Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir. 2001). *See also Alberni v. McDaniel*, 458 F.3d 860, 864 (9th Cir. 2006) ("The Supreme Court has established a general principle that evidence that 'is so extremely unfair that its admission violates fundamental conceptions of justice' may violate due process.") (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)); *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998) (stating a federal habeas court's "role is limited to determining whether the admission of evidence rendered the trial so fundamentally unfair as to violate due process."). The Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling*, 493 U.S. at 352.

The Supreme Court has never ruled evidence of gang affiliation is inadmissible when it is relevant to a material issue in the case. *See, e.g.*, *Pena v. Tilton*, 578 F. App'x 695, 695 (9th Cir. 2014) (finding the state court's determination that admission of gang-related evidence did not violate the petitioner's due process rights was not contrary to clearly established federal law). *See also, e.g.*, *Michelson v. United States*, 335 U.S. 469, 475 (1948) (stating "[t]he State may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive *that he is by propensity* a probable perpetrator of the crime.") (emphasis added). Similarly, "[t]he Supreme Court has expressly reserved the question of whether using evidence of the defendant's past crimes to show that he has a propensity for criminal activity could ever violate due process." *Larson v. Palmateer*, 515 F.3d 1057, 1066 (9th Cir. 2008) (citing *Estelle*, 502 U.S. at 75 n.5).

1   "Admission of evidence violates due process '[o]nly if there are *no* permissible

2   inferences the jury may draw' from it." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir.

3   2005) (emphasis in original) (quoting *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th

4   Cir. 1991)). Even then, the evidence must "be of such quality as necessarily prevents a

5   fair trial." *Jammal*, 926 F.2d at 920. "Under AEDPA, even clearly erroneous admissions

6   of evidence that render a trial fundamentally unfair may not permit the grant of federal

7   habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by

8   the Supreme Court." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (citing 28

9   U.S.C. § 2254(d)). "In cases where the Supreme Court has not adequately addressed a

10  claim, [a federal circuit] court cannot use its own precedent to find a state court ruling

11  unreasonable. *Id.* (citing *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) and relying

12  on *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). "Although the [Supreme] Court has been

13  clear that a writ should be issued when constitutional errors have rendered the trial

14  fundamentally unfair . . . it has not yet made a clear ruling that admission of irrelevant or

15  overtly prejudicial evidence constitutes a due process violation sufficient to warrant

16  issuance of the writ." *Id.*

17                    **3.     NSC's Determination**

18  The Nevada Supreme Court rejected this claim on direct appeal:

19  *Gang membership*

20          Appellant contends that the district court abused its discretion by
    admitting evidence of his gang membership. In order for gang membership

21  to be admissible, the district court must determine that (1) the gang
    membership is relevant and is offered for a non-propensity purpose, (2) the

22  gang membership is proven by clear and convincing evidence, and (3) the
    probative value of the evidence is not substantially outweighed by the

23  danger of unfair prejudice. *Tinch v. State*, 113 Nev. 1170, 1176, 946 P.2d
    1061, 1064-65 (1997), *holding modified by Bigpond v. State*, 128 Nev., 9

24  Adv. Op. 10, 270 P.3d 1244 (2012). Here, the district court was presented
    with substantial evidence that appellant was associated with a gang and

25  that gang affiliation was a precursor to the shooting. This evidence was not
    presented to show that appellant had a propensity for violence, but to

26  provide a motive for the shooting. *See Lay v. State*, 110 Nev. 1189, 1196,
    886 P.2d 448, 452 (1994). Appellant fails to demonstrate that the district

27  court abused its discretion by admitting this evidence. *See Bigpond*, 270

28

                                            19

P.3d at 1250 (reviewing a district court's decision to admit evidence for an abuse of discretion).

(ECF No. 53-11 at 5.)

### 4.    Analysis of Ground 1

The state-court record demonstrates reasonable inferences could be drawn that the gang evidence was relevant to establish a non-propensity purpose, i.e., a motive, for the shooting. *See Jammal*, 926 F.2d at 920. Even setting aside Crow's testimony that a Gang NET entry classified Bolanos as a self-admitted Norteño, reasonable inferences could be drawn from the circumstances of the shooting, Bolanos's tattoos and statements for jail housing classification, and Crow's testimony that former gang members may still owe allegiances even if they are no longer active, that, despite claims Bolanos was no longer an actively affiliated Norteño, he nonetheless maintained allegiance to the causes of the gang in the context of the shootings. Given the cautionary instruction to the jury, the gang-affiliation evidence did not prevent a fair trial in violation of federal due process.

Bolanos contends, notwithstanding the State's argument the evidence was relevant to motive, because Bolanos was not present during J.S.'s argument with Lopez, the sole purpose of the gang-related evidence was to show Bolanos had a propensity for violence and was a bad person. The State, however, argued it sought admission of the evidence to establish Bolanos's motive for the shootings. *See supra*. And the cautionary instruction directed the jury it could consider that evidence as to motive and not as evidence of bad character. *See supra*.

Bolanos claims Crow lacked firsthand knowledge that Bolanos was in a gang and Crow admitted the incident at the FHD did not strike him as a typical "gang hit-up" that would spark violence. Crow's lack of firsthand knowledge did not render his testimony fundamentally unfair as the jury could draw conflicting inferences from the evidence whether Bolanos maintained gang allegiance at the time of the shootings and whether the incident was the result of a gang hit up that sparked violence. Such evidence includes among other things that: (1) Lopez and Villa testified they were Sureño gang members;

(2) Veilman heard J.S. start an argument with Lopez and stated, "This is Norte," which she knew to be a gang-related remark; (3) Mariela told Carrillo, "18th Street is starting crap with her brother"; (5) Norteño and Sureño gang members are well-known rivals; (6) surveillance video depicts Bolanos came out of the FHD and conversed with Gustavo and J.S., before going into the garage; (7) Villagrana and Carrillo saw Bolanos with a rifle behind the victim's truck; (8) Carrillo saw Bolanos shoot the rifle; and (8) Bolanos fought with Lopez and fled the scene. *See supra*. Bolanos contends Crow was not qualified to testify as a gang expert because Crow lacked adequate knowledge regarding Carson City Norteños and Sureños. The defense was aware of this argument and did not pursue it during trial. *See supra*. And it was not fundamentally unfair to present Crow's testimony as his expertise was evident from his experience with the gangs at issue in the case, i.e., Carson City Sureños and Kings Beach Norteños. *See supra*.

The NSC's determination was neither contrary to, nor involved an unreasonable application of, clearly established Supreme Court authority, and is not based on an unreasonable determination of fact. Bolanos is therefore not entitled to federal habeas relief on Ground 1.

### B.    Ground 2—Exclusion of Impeachment Testimony

Bolanos alleges the trial court violated his rights to due process, a fair trial, and to present a complete defense under the Fifth, Sixth, and Fourteenth Amendments when it excluded Adrian Garcia's testimony regarding Carrillo's bias. (ECF No. 28 at 13-16.) Respondents contend Bolanos fails to establish the NSC's application of state evidentiary law violated his federal constitutional rights to due process and a fair trial, or that the error, if any, had substantial and injurious effect or influence in determining the jury's verdict. (ECF No. 72 at 17-21.)

#### 1.    Additional Background

The State filed a motion to preclude reference to Osvaldo shooting Bolanos's best friend, Garcia. (ECF No. 36-4.) Bolanos opposed the motion asserting Osvaldo is Carrillo's brother and that Carrillo was biased and had a motive to lie by identifying

Bolanos as the shooter because she swore revenge against Bolanos for testifying against Osvaldo. (ECF No. 38-4 at 3-4.) Bolanos argued that if Carrillo denies this, the defense will present extrinsic evidence that Carrillo indicated to the Bolanos family payback would occur for her brother having been sent to prison. (*Id.*) He argued failure to allow this impeachment would violate the Sixth Amendment right to Confrontation and to Present Evidence of a Defense. (*Id.* at 5.)

At the hearing on the motion, the trial court stated it intended to allow "some" testimony about Osvaldo's "situation" as it was "persuaded" that "it could demonstrate bias, if believed" and if the jury were to discount Villagrana, Lopez, and Carrillo's eyewitness testimony. (ECF No. 39-1 at 183-84.) The State argued Carrillo stated under oath that she did not know Bolanos was a witness in Osvaldo's case. (*Id.* at 186-87.)

Bolanos explained that he would seek to impeach Carrillo by showing, through Mariela's testimony, that Carrillo was biased due to a family feud, i.e., (1) Osvaldo shot a good friend of Bolanos; (2) Gustavo participated in Osvaldo's arrest; (3) Carrillo believed Gustavo provided information that led to Osvaldo's conviction; and (4) Carrillo personally threatened or advised Mariela she will "get" the Bolanos family. (*Id.* at 189-90.) The trial court ruled, "I would just indicate that bias is always relevant, especially if it goes to credibility. Prior to Carrillo's testimony, we will have a brief, little hearing outside the presence, lay your offer of proof, and we'll go from there." (*Id.* at 191.)

Bolanos proffered Mariela would testify Carrillo had ill will toward the Bolanos family because: (1) Osvaldo was accused of shooting Bolanos's best friend; (2) Carrillo was aware Gustavo drove to the police station in Bolanos's vehicle; (3) Carrillo was convinced the Bolanos family cooperated in obtaining Osvaldo's conviction; and (4) Carrillo advised Mariela she would get back at the Bolanos family for their cooperation. (ECF No. 41-1 at 24-26.) The trial court ruled "Her belief is sufficient. So it's certainly not being offered for the truth of the matter. So I will permit the question you know, that information coming out, and the belief of why it is that he had something to do with her brother's incarceration. But anything beyond that would not be permitted." (*Id.* at 31.)

1    At trial, Carrillo admitted there was bad blood between her family and the Bolanos

2    family because Osvaldo went to prison for shooting Bolanos's best friend, Garcia. (ECF

3    No. 46-1 at 221-23.) She admitted Osvaldo and Bolanos were not friends, but she claimed

4    she was unaware whether the Bolanos family testified against Osvaldo and that she had

5    no ill will toward the Bolanos family. (*Id.* at 178, 222-23, 249-50.) She "didn't know that

6    [Bolanos] testified against [her] brother, until the preliminary hearing," in Bolanos's case,

7    when defense counsel informed her, and even then, she was not upset at anybody

8    because "it was [Osvaldo's] action," and she would never blame Bolanos for something

9    he didn't do. (*Id.* at 245.) Carrillo denied begging Garcia not to press charges against

10   Osvaldo. (*Id.* at 252.) Bolanos asked the trial court to reconsider allowing Garcia to testify

11   and the trial court ruled, "Not at this time. Not on this record." (ECF No. 47-1 at 88.)

12   The State later objected to Bolanos calling Mariela to impeach Carrillo's testimony.

13   (ECF No. 48-1 at 207-08.) The trial court overruled the objection, concluded Mariela's

14   testimony about Carrillo's denial of bias and ill will was not offered for the truth of the

15   matter asserted, and stated it would advise the jury of that. (*Id.*)

16   The defense again asked the trial court to permit Garcia to testify Carrillo lied when

17   she denied she asked Garcia to lie about whether Osvaldo shot him. (ECF No. 48-1 at

18   208-10.) Bolanos proffered Garcia would testify when he refused to lie to police, Carrillo

19   threatened, "You better watch your back." (*Id.*) The trial court ruled "you would be

20   impeaching [Carrillo] now on a collateral issue. You would be doing that extrinsically. And

21   I'm not going to let that happen." (*Id.*) Bolanos argued, "It's not actually collateral to the

22   extent it is the basis of what we claim is her bias; and, further, the basis of what we claim

23   is her reasoning for coming forward with the story she has told the jury." (*Id.*) The trial

24   court ruled, "The issue of her conversation with Mr. Garcia, I believe, is a collateral matter.

25   The bias is—can be explored through Mariela. But I'm not going to let Mr. Garcia testify

26   to that." (*Id.* at 210-11.)

27   Mariela thereafter testified Carrillo's brother, Osvaldo, shot Bolanos's good friend,

28   Garcia in May of 2005. (ECF No. 48-1 at 212-15, 219.) Gustavo drove a witness to the

23

1    police station in a vehicle that Bolanos normally drove, Mariela was also present at the

2    police station, and Mariela believed Carrillo thought the Bolanos' were involved and that

3    Gustavo cooperated with the police. (*Id.*) Mariela said Carrillo confronted her about this,

4    called the Bolanos family "snitches," and threatened the Bolanos family was going to pay

5    for what they did. (*Id.*) Mariela did not go to the police about the threat but warned her

6    parents so they could stay away from Carrillos. (*Id.* at 216-18.) Mariela's mother testified

7    that Mariela had warned her about the Carrillo's family. (*Id.* at 230-31.)

8                      **2.      Applicable Legal Standards**

9        "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment

10    . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . .

11    the Constitution guarantees criminal defendants 'a meaningful opportunity to present a

12    complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations

13    omitted). However, the Supreme Court has recognized "'state and federal rulemakers

14    have broad latitude under the Constitution to establish rules excluding evidence from

15    criminal trials.'" *Nevada v. Jackson*, 569 U.S. 505, 509-10 (2013) (citing *Holmes v. South

16    Carolina*, 547 U.S. 319, 324 (2006) and quoting *United States v. Scheffer*, 523 U.S. 303,

17    308 (1998)). Thus, the Supreme Court has explained that "A defendant's right to present

18    relevant evidence is not unlimited, but rather is subject to reasonable restrictions."

19    *Scheffer*, 523 U.S. at 308. Rules and restrictions on presentation of evidence "do not

20    abridge an accused's right to present a defense so long as they are not 'arbitrary' or

21    'disproportionate to the purposes they are designed to serve." *Id.* The Supreme Court has

22    furthermore observed, "[o]nly rarely have we held that the right to present a complete

23    defense was violated by the exclusion of defense evidence under a state rule of

24    evidence." *Jackson*, 569 U.S. at 509.

25        NRS § 50.085(3) proscribes:

26        Specific instances of the conduct of a witness, for the purpose of attacking
          or supporting the witness's credibility, other than conviction of crime, may
27        not be proved by extrinsic evidence. They may, however, if relevant to
          truthfulness, be inquired into on cross-examination of the witness or on
28

cross-examination of a witness who testifies to an opinion of his or her character for truthfulness or untruthfulness, subject to the general limitations upon relevant evidence and the limitations upon interrogation and subject to the provisions of NRS § 50.090.

"NRS 50.085(3) permits impeaching a witness on cross-examination with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness." *Butler v. State*, 102 P.3d 71, 79-80 (Nev. 2004). The NSC "has cautioned that in so doing the State may generally not impeach a witness under NRS 50.085(3) on a collateral matter or by introducing extrinsic evidence."[8] *Id.* If, for example, "[t]he witness denies a specific act on cross-examination, the State may not introduce extrinsic evidence to the contrary." *Id.* The NSC has explained that the purpose of NRS § 50.085(3)'s rule "banning extrinsic evidence is to focus the fact-finder on the most important facts and conserve 'judicial resources by avoiding mini-trials on collateral issues.'" *Abbott v. State*, 138 P.3d 462, 476 (2006). "However, this policy is only applicable with regard to collateral issues, and the policy is not served when the extrinsic evidence relates to a central issue in the case." *Id.* "An issue is central if it is a 'crucial issue directly in controversy.'" *Id.*

In *Jackson*, the Supreme Court stated, "this Court has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." 569 U.S. at 512 (citing *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (observing "the Confrontation Clause is generally satisfied when the defense is

---

[8]Collateral facts are outside the controversy or not directly connected with the principal matter or issue in dispute. *See Lobato v. State*, 96 P.3d 765, 770 (Nev. 2004). "The 'collateral fact' rule, however, has only limited application." *Id.* "[E]xtrinsic evidence relevant to prove a witness's motive to testify in a certain way, *i.e.,* bias, interest, corruption or prejudice, is never collateral to the controversy and not subject to the limitations contained in NRS 50.085(3)." *Id.* "However, use of specific instances of conduct—*i.e.,* an untruthful act not resulting in a conviction—and use of prior inconsistent statements, raise issues under the so-called collateral-fact rule when coupled with a specific contradiction." *Id.* "Accordingly, extrinsic proof of a prior inconsistent statement is inadmissible unless the statement is material to the case at hand." *Id.* "NRS 50.085(3) limits the admissibility of extrinsic evidence for the purpose of attacking credibility based upon specific instances of conduct attributable to the witness." *Id.* "Unless in some way related to the case and admissible on other grounds, extrinsic prior bad act evidence is always collateral and therefore inadmissible to attack credibility." *Id.*

given a full and fair opportunity to . . . expose [testimonial] infirmities through cross-examination")). The Supreme Court in *Jackson* moreover ruled the constitutionality of NRS § 50.085(3) could not be disputed as the purposes of the rule as explained in *Abbott*, 138 P.3d at 476 "[a]re "good reason[s]" for limiting the use of extrinsic evidence and the Nevada statute is akin to the widely accepted rule of evidence law that generally precludes the admission of evidence of specific instances of a witness's conduct to prove the witness's character for untruthfulness. *Id.* at 510 (internal citations omitted).

### 3.    NSC's Determination

The NSC determined on direct appeal that the inquiry about Carrillo's threats to Garcia were not relevant to whether she harbored a bias against Bolanos:

> *Evidence of bias*
>
> Appellant contends that the district court abused its discretion by prohibiting him from presenting extrinsic evidence which would have established that one of the witnesses against him was biased. Below, appellant explained that the witness promised to "get" him because she believed members of his family participated in an unrelated prosecution against her brother. The district court permitted the defense to question the witness and appellant's sister about the issue but refused to let appellant elicit that the witness made similar threats against another person. Appellant fails to demonstrate that the district court abused its discretion because the latter inquiry was not relevant to whether the witness harbored a bias against him. *See Lobato v. State,* 120 Nev. 512, 520, 96 P.3d 765, 771 (2004).

(ECF No. 53-11 at 5-6.)

### 4.    Analysis of Ground 2

The NSC's determination is neither contrary to nor constitutes an unreasonable application of Supreme Court authority because, as explained, the Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce extrinsic evidence for impeachment purposes." *Jackson*, 569 U.S. at 512. Bolanos argues the NSC ignored *Davis v. Alaska*, 415 U.S. 308 (1974). *Davis*, however, did not concern the right to present extrinsic evidence to impeach a witness; rather, it concerned whether the Confrontation Clause allowed impeachment of the credibility of a prosecution witness *by cross-examination* directed at possible bias. *See Davis*, 415 U.S. at 309. Bolanos was

not denied that right. He cross-examined Carrillo about her bias and motivation to falsely identify him as the gunman by exploring her perception that the Bolanos family may have assisted law enforcement in the prosecution of Osvaldo for shooting Garcia. He also elicited testimony from his sister and mother to contradict Carrillo's testimony that she did not threaten to get back at the Bolanos family for helping to prosecute her brother.

Bolanos argues it was unconstitutional to deny him the right to present Garcia's testimony to contradict Carrillo's denial that she asked Garcia to lie about who shot him and threatened him if he did not lie. He claims such testimony was extrinsic but admissible under state law as relevant to a mode of impeachment that does not implicate the collateral-fact rule, i.e., to establish Carrillo's motivation to give false testimony against Bolanos. As explained, "[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle*, 502 U.S. at 67-68. And, under 28 U.S.C. § 2254(a), the correctness of a state trial court's evidentiary ruling as a matter of state law "is irrelevant to [federal habeas] review, because a federal court may entertain an application for a writ of habeas corpus 'only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Larson*, 515 F.3d at 1065. Furthermore, the Supreme Court stated in *Jackson* that the constitutionality of NRS § 50.085(3) could not be disputed as the NSC has given "good reason[s]" for limiting the use of extrinsic evidence. *Jackson*, 569 U.S. at 510. The state-court record also establishes it was reasonable to conclude Garcia's proffered testimony about Carrillo's request that he lie in his case and her threats against him in his case, were irrelevant to Carrillo's bias against Bolanos because Garcia's case was wholly unrelated to Bolanos's case, and that specific testimony from Garcia would not establish Carrillo's motive or interest in testifying for the State against Bolanos in Bolanos's case.[9]

---

[9]*See Lobato*, 96 P.3d at 771. *See also* NRS § 48.015. The Court notes the defense proffered Garcia's testimony in its case in chief to impeach Carrillo's denial on cross-examination that she urged Garcia to lie about Garcia's case and threatened him if he did not do so. Although a witness's credibility is always relevant, Garcia's testimony appears

1    The NSC's determination that the exclusion of Garcia's testimony did not violate

2    Bolanos's right to present a defense is neither contrary to nor constitutes an unreasonable

3    application of clearly established federal law as determined by the Supreme Court and is

4    not based on an unreasonable determination of fact considering the evidence presented

5    during the state court proceedings. Ground 2 is denied.

6    **C.    Ground 3—Preliminary Hearing Testimony**

7    Bolanos alleges the trial court violated his rights to due process and a fair trial

8    under the Fifth, Sixth, and Fourteenth Amendments by allowing the State to read John

9    Bolanos's preliminary hearing testimony in lieu of trial testimony. (ECF No. 28 at 16-20.)

10    Respondents contend, even assuming the NSC reasonably concluded the trial court

11    erred, the NSC's application of *Chapman*'s harmless error standard is objectively

12    reasonable. (ECF No. 72 at 21-27.)

13    **1.    Additional Background**

14    Defense counsel cross-examined John at the preliminary hearing. (ECF Nos. 39-

15    1 at 115, 45-2 at 140.) Trial was scheduled for February 4, 2014. (ECF No. 40-2.) On

16    January 27, 2014, the State filed an application to secure John's attendance and

17    testimony at trial. (ECF No. 36-12; 36-13.) Two days later, the State moved for admission

18    of John's preliminary examination testimony claiming the State believed it had an

19    agreement to serve John with a trial subpoena at defense counsel's office, John refused

20    to cooperate with that agreement, and John could not be located. (ECF No. 38-2.) The

21    defense argued the motion was untimely, there was no such agreement, and the State's

22    failure to act in a timely fashion resulted in its predicament. (ECF No. 39-1 at 143-157.)

23    The trial court found good cause for the tardy motion, that John was unavailable to testify,

24    and granted the motion. (*Id.* at 161-63.)

25

26    to have been excludable as extrinsic evidence concerning a collateral matter. NRS §
27    50.085(3); *Lobato*, 96 P.3d at 770. *See also supra* at p. 25. And, the Supreme Court has
determined the reasons underlying NRS § 50.085(3), i.e., "to focus the fact-finder on the
28    most important facts and conserve 'judicial resources by avoiding mini-trials on collateral
issues,'" justify the rule. *See Jackson*, 569 U.S. at 509.

1    John's preliminary hearing testimony, including cross-examination by defense

2    counsel, was read to the jury. (ECF No. 45-2 at 3.) John testified he went toward the

3    garage when he heard gunfire out of concern about his family's safety as he assumed

4    Bolanos, Mariela, and Gustavo were in the garage. (*Id.* at 114-15.) John "bumped heads"

5    with a guy who came out of the garage, and they got into a fight at the bottom of the ramp.

6    (*Id.* at 116-20, 142-43.) John testified Bolanos attempted to break up John's fight by

7    separating him from the unknown Hispanic male, but the Hispanic male kept "swinging"

8    at them, so John and Bolanos hit the man. (*Id.* at 144, 165, 170-71.) John told detectives

9    a fourth individual, possibly Gustavo, joined the fight, wore "all-black" and "took off

10    besides the river" but it was "pitch-black" dark outside, and John was focused on the fight

11    and did not see whether that fourth individual's hands were empty. (*Id.* at 136-37, 148-

12    49, 158.) John and Bolanos fought the Hispanic male until Bolanos let him go. (*Id.* at 124.)

13    John denied seeing Bolanos run down the ramp with a rifle, denied Bolanos had a

14    rifle in his hands or that he saw one on the ground, and denied telling police he saw

15    Bolanos with a gun that night. (*Id.* at 144-46, 155-57.) He told the detectives "probably

16    seven to 10 times" he did not see Bolanos with a gun. (*Id.* at 159.) He told the detectives

17    Bolanos had something in his hand and testified it was "probably a cloth, because he had

18    a wound on his head." (*Id.* at 122-23, 129-30, 172-73.) John told police the object was

19    black, but denied telling them it was as long as a rifle, and claimed he told police Bolanos

20    hit the Hispanic male "with his hand." (*Id.* at 123-24.) John was worried police would blame

21    him as the shooter, and after police repeatedly insisted Bolanos had a rifle, John relented

22    that it was possible Bolanos had a gun, but John did not pay attention "because of

23    everything." (*Id.* at 159-60, 171-72.) John agreed he told the police "If you connect the

24    dots, Arturo Bolanos is the one who did the shooting," but claimed he "said it in a way

25    that, 'You do your job. I'm not helping you out to solve this case.'" (*Id.* at 130.)

26    **2.    Standards for Evaluating Admission of Prior Testimony**

27    The Supreme Court has held the Confrontation Clause bars the admission of

28    testimonial statements of a witness who did not appear at trial unless he was unavailable

to testify, and the defendant had a prior opportunity for cross-examination.[10] *See Crawford v. Washington*, 541 U.S. 36, 54 (2004); *see also Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (stating "[g]enerally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.").

A witness is not "unavailable" for purposes of the confrontation requirement unless the prosecutorial authorities made a good-faith effort to obtain his presence at trial. *See Barber v. Page*, 390 U.S. 719, 724-25 (1968). "The law does not require the doing of a futile act. Thus, if no possibility of procuring the witness exists (as, for example, the witness'[s] intervening death), 'good faith' demands nothing of the prosecution. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980). "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Id.* "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." *Id.*

---

[10]At the relevant time in Nevada, preliminary hearing testimony could be used:

By the State if the defendant was represented by counsel or affirmatively waived his or her right to counsel, upon the trial of the cause, and in all proceedings therein, when the witness is sick, out of the State, dead, or persistent in refusing to testify despite an order of the judge to do so, or when the witness's personal attendance cannot be had in court.

NRS § 171.198(6)(b), *as amended by* Laws 1995, p. 570. A transcript of a witness's preliminary hearing testimony may be admitted into evidence at a criminal trial without violating defendant's right to be confronted with witnesses testifying against him on three conditions: (1) if defendant was represented by counsel at preliminary hearing, (2) counsel was provided with adequate opportunity to cross-examine witness at preliminary hearing, and (3) witness is unavailable at time of trial. *See Power v. State*, 724 P.2d 211, 212 (Nev. 1986). A motion to admit prior testimony is subject to the 15-day pretrial deadline enumerated in NRS § 174.125. *See Hernandez v. State*, 188 P.3d 1126, 1128-29 (Nev. 2008). Motions filed beyond that deadline require an affidavit providing good cause for the untimely motion. *See id.* "Good cause to allow an untimely motion exists only when the proponent has exercised reasonable diligence to procure the attendance of the witness before the expiration of the motion deadline." *Id.*

On direct review, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). *See e.g.*, *United States v. Boulware*, 384 F.3d 794, 808-09 (9th Cir. 2004) (applying *Chapman*'s "harmless beyond a reasonable doubt" standard to erroneous evidentiary ruling that violated defendant's federal due process rights). Where there is a trial error of constitutional dimension, and AEDPA governs, it is a precondition to relief for federal habeas corpus purposes, that a federal habeas court find, in accordance with AEDPA, that the state court's decision applied *Chapman* in an objectively unreasonable manner. *See Davis v. Ayala*, 576 U.S. 257, 267-70 (2015). *See also Brown v. Davenport*, 596 U.S. 118, 122 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)] and the one Congress prescribed in AEDPA.").

### 3.    NSC's Determination

On direct appeal, the NSC determined the state district court erred because the State failed to establish good cause to read John's preliminary examination testimony in lieu of his live testimony, but the error was harmless beyond a reasonable doubt:

*Preliminary hearing testimony*

Appellant contends that the district court erred by granting the State's untimely motion to introduce his cousin John's preliminary hearing testimony. Testimony given during a preliminary hearing may be used at trial if (1) the defendant was represented by counsel at the preliminary hearing, (2) counsel cross-examined the witness, and (3) the witness is shown to be unavailable at the time of trial. *Hernandez v. State,* 124 Nev. 639, 645, 188 P.3d 1126, 1130 (2008). NRS 174.125 requires a party to move to admit preliminary hearing testimony at least 15 days before trial, unless good cause is shown. *Id.* To demonstrate good cause, the State must show that it made reasonable efforts to procure the witness' attendance before the statute's deadline expired. *Hernandez,* 124 Nev. at 648, 188 P.3d at 1133.

Five days before trial, the State requested permission to admit John's preliminary hearing testimony, explaining that it had good cause to excuse the tardy filing because the defense had agreed to assist the State in serving John, but failed to follow through. The defense argued that it offered to help the State but never promised that it would, or could, ensure that John

1
2
3
4
5
6
7
8
9
10

would be served. After taking into consideration an email exchange between the prosecutor and defense counsel, as well as argument from both individuals regarding their oral conversations, the district court concluded that the State's belief that the defense would assist them in serving John constituted good cause to excuse the untimely filing. Giving deference to the district court's factual findings, *id.* at 647, 188 P.3d at 1132; we conclude that any statements made by the defense did not create a situation in which the State could reasonably rely solely on the defense to ensure that John would be served. The State knew that John was uncooperative and the vague arrangement surrounding the issue does not satisfy the good cause requirement. *See id.* at 650, 188 P.3d at 1134 (explaining that good cause "must be determined upon considering the totality of the circumstances"). However, we conclude that this error was harmless. *See id.* at 652-53, 188 P.3d at 1135-36. John's testimony was more exculpatory than incriminating, and considering the substantial evidence against appellant, admitting John's statement did not influence the verdict.

11    (ECF No. 53-11 at 2-3.)

12          **4.    Analysis of Ground 3**

13          The NSC's application of *Chapman*'s harmless-beyond-a-reasonable-doubt

14    standard[11] is objectively reasonable and is based on an objectively reasonable

15    determination that John's testimony was "more exculpatory than incriminating." John

16    repeatedly testified he did not see Bolanos with a firearm and Bolanos tried to break up

17    John's fight with the Hispanic male. And given that three eyewitnesses, Villagrana,

18    Carrillo, and Lopez saw Bolanos with a firearm, Villagrana saw Bolanos cock the firearm,

19    and Carrillo saw Bolanos shoot the firearm at the Chevy Tahoe, the NSC reasonably

20    applied *Chapman* in determining the erroneous admission of John's preliminary hearing

21    testimony was harmless beyond a reasonable doubt. Bolanos is not entitled to federal

22    habeas relief on Ground 3.

23          **D.    Ground 4—Motion to Suppress Statements to Police**

24          Bolanos alleges the trial court erred when it denied his motion to suppress his

25    statements to police because he was subject to custodial interrogation without benefit of

26

27          [11]The NSC's reliance on *Hernandez* indicates that it properly applied the *Chapman*
28    harmless error standard to the error. *See Hernandez,* 188 P.3d at 1136 & n.40-42 (applying *Chapman* standard to find erroneous admission of prior testimony harmless).

1    warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966) rendering the admission at trial

2    of his statements to police a violation of his right to due process and against self-

3    incrimination under the Fifth and Fourteenth Amendments. (ECF No. 28 at 20-24.)

4    Respondents contend that even assuming the NSC reasonably concluded the trial court

5    erred, the NSC's application of *Chapman*'s harmless error standard is objectively

6    reasonable. (ECF No. 72 at 34-41.)

7    **1.    Additional Background**

8    Bolanos moved to suppress his statements to the police. (ECF Nos. 36-5, 38-5.)

9    At the hearing on the motion, Detective Ferguson testified he did not give Bolanos

10   *Miranda* warnings because Bolanos was, at that time, considered a victim or a witness.

11   (ECF No. 40-2 at 52-53, 58-60, 65-66, 71-72, 85-86.) The State argued Bolanos did not

12   implicate himself in the commission of a crime during the first and second parts of the

13   three-part interview and did not oppose the motion to suppress statements made during

14   the third part of the interview. (*Id.* at 11, 13.)

15   The trial court found no *Miranda* violation and denied the motion to suppress:

16   THE COURT: [S]o I am going to deny the defense motion to suppress
     statements. I will submit a written motion in more detail. In the interests of
17   time, I will give you the thrust of it. It's clear at some point, after the initial
     contact that's based upon the contact of the citizen, at that initial contact,
18   yes, he's in custody. He's taken at gunpoint. Very shortly thereafter, two
     officers arrive. We have a period of time where it is clear from the first
19   interview that Officer Ferguson is given some information that the defendant
     is a victim. That has to come from somewhere. It would seem that the
20   testimony suggests that came from conversations—or at least it's indicated
     here with Officer Harkin [sic].
21
22       So the factors that having reviewed the video that he had the
     opportunity to visit with his family. I would note in interview number one, at
23   the time, the entire discussion is about him being a victim at the scene. I will
     rely, because I think it's more reliable—the video itself—for what the content
24   of requests are. I did read the video both in context to suggest he was
     requesting counsel on the swabs, to make a decision about whether or not
25   to relay the swabs, and otherwise hadn't provided any other reluctance to
     speaking with police, at that time.
26
27       I'd note throughout—even in interview one I'm sorry—detectives
28   indicate that he has a chance—he says, "I'll call my mom." You know,

33

1
2

there's some indication later that the officer thought he already called his mom. He was in possession of his cell phone, other items in his pockets, throughout that interview.

3
4

At different points in the first interview, Detective Ferguson is in and out of the room. He leaves the door open.

5
6
7

The fact that people aren't permitted to move freely about a secure area—a police station—that's not unusual in many businesses that it happens. Obviously, it's—you know, in this context, I understand the point; but it doesn't rise to the level of putting him in custody during the first interview, from my perspective.

8
9
10

He starts the second interview and the third interview with words to the effect of, "I appreciate you hanging out." That's in the second interview. The third one is, "I appreciate you—thank you for being patient." Which all suggests that it's a voluntary contact that is still occurring.

11
12

Now, clearly, in interview three, I think that's the first real invocation of counsel. And that appears at page 4. When it starts, it starts to be a narrow one for the polygraph.

13

"I want an attorney to talk to that."

14

Then it's like, "Do you want to talk to us, at all?"

15

"No."

16
17
18

And at that point—the State is not introducing the third interview, is my understanding—clearly, in the third interview, the finger of suspicion is now clearly pointed at Mr. Bolanos. That would be a different analysis, if you were offering those statements at this time.

19
20

I would also note that counsel is correct in the second interview, at 33 minutes, that Mr. Bolanos goes to the door and tries the door and finds it locked.

21
22
23
24

And I think that's telling, in that on the video nobody seems to be more surprised than Mr. Bolanos at that point in time that the door is locked. He tries it a couple of times, he tries it a couple times, and then he knocks. Because the door has at least from what I can see on the video—been either open or unlocked throughout that.

25
26

And, again, the tenor of the discussion doesn't start to change until the second interview.

27

So I will flesh it out further in writing.

28

(*Id.* at 18-22.)

34

Following trial and sentencing, the trial court filed a written order denying the motion to suppress in which it concluded:

> The Court finds the totality of the circumstances suggest Defendant was not in custody. At the beginning of the interview, the focus was on Defendant's attackers as he had alleged he was the victim of an attack. Defendant was not given his *Miranda* rights because the questioning began as an interview, not an interrogation. Further, objective indicia of arrest are lacking: Defendant was in a police station, yet he never asked to leave, and in the third part of the interview, he indicated to Detective Ferguson he understood that just because someone is at a police station does not mean they are arrested. Police stations are controlled environment[s] and as such, Defendant was not permitted to roam freely without escorts. Additionally, Defendant was not restrained and was allowed to use the bathroom and smoke cigarettes outside, as well as sit with friends and other members of his family in between the interviews.
>
> Moreover, Defendant's request for an attorney was tied to the State's request for a DNA swab and a polygraph test. The State did not take a swab or conduct a polygraph test, but instead stated Defendant could have his attorney present for either if he desired. Detectives ceased questioning Defendant during interview three once he unambiguously invoked his right to an attorney.

(ECF No. 51-4.)

At trial, Officer Hakin testified he stopped Bolanos, noticed blood on Bolanos's head, asked what happened, and Bolanos replied he was "a victim and had been jumped" and did not know the people in the silver Lexus who tried to pull him into that car. (ECF No. 41-1 at 212-14.) The video of Bolanos's interviews with Detective Ferguson was played for the jury and admitted into evidence along with Bolanos's written statement, which Ferguson said was consistent with his interview statements. (ECF Nos. 48-1 at 182-83, 187-92, 40-1 at 2, 12.) Ferguson also testified Bolanos claimed a friend dropped him off in front of the Men's Club near the FHD and he walked from there to FHD. (ECF No. 48-1 at 177-181, 183-84.) Bolanos told him that after he left the FHD, he was hit by an unknown object near the grassy area, knocked to the ground, saw a Hispanic male with several others behind him, and got up and ran away, believing something hit his leg or calf as he fled. (*Id.*) Bolanos stated "a vehicle pulled up beside him. The door opened," and "several hands" "reached out to him and tried to pull him into the car," but he did not

1   recognize the vehicle as anybody he knew. (*Id.*)

2               **2.    Standards for Evaluating *Miranda* violation.**

3          "[T]he prosecution may not use statements, whether exculpatory or inculpatory,

4   stemming from custodial interrogation of the defendant unless it demonstrates the use of

5   procedural safeguards effective to secure the privilege against self-incrimination."

6   *Miranda*, 384 U.S. at 444. Admissions of statements obtained in violation of *Miranda* are

7   subject to direct review under *Chapman*'s harmless-beyond-a-reasonable-doubt

8   standard. *See Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) ("[T]he test for

9   determining whether a constitutional error is harmless is whether it appears 'beyond a

10  reasonable doubt that the error complained of did not contribute to the verdict obtained.'").

11  Where there is a trial error of constitutional dimension, and AEDPA governs, it is a

12  precondition to relief for federal habeas corpus purposes, that a federal habeas court find

13  the state court's decision applied *Chapman* in an objectively unreasonable manner. *See*

14  *Davis*, 576 U.S. at 267-70; *Brown*, 596 U.S. at 122.

15              **3.    NSC's Determination**

16         On direct review, the NSC determined the trial court erred when it admitted

17  Bolanos's statements to police, but the error was harmless:

18         *Appellant's statements to law enforcement*

19              Appellant contends that the district court erred by admitting his
20         statements to law enforcement because he was subjected to a custodial
           interrogation without the protections afforded by *Miranda v. Arizona,* 384
21         U.S. 436 (1966). *Miranda* requires that any interrogation of a suspect in
           custody "be preceded by advice to the putative defendant that he has the
22         right to remain silent and also the right to the presence of an attorney."
           *Edwards v. Arizona,* 451 U.S. 477, 481-82 (1981) (citing *Miranda,* 384 U.S.
23         at 479). An individual is in custody for *Miranda* purposes if a reasonable
           person in his position would not feel like he is free to terminate the
24         conversation. *Rosky v. State,* 121 Nev. 184, 191, 111 P.3d 690, 695 (2005)
           (identifying the relevant factors for determining whether a suspect is in
25         custody). We review a district court's custody determination de novo. *Id.* at
           190, 111 P.3d at 694.
26

27              Having considered the factors identified in *Rosky,* we conclude that
           the district court erred.
28

1
2
        [FN 1] Because these statements were inappropriately admitted, we need not address whether appellant invoked his right to counsel.

3
4
5
6
7
8
9
Law enforcement detained appellant at gunpoint, handcuffed him, and escorted him to the police station. Although appellant identified himself as a victim thereafter, and his questioning was mostly consistent with that narrative, the initial show of force used by law enforcement was substantial. Thus, while some of the *Rosky* factors weigh in favor of the State, that initial show of force, along with other indicia of arrest, outweigh any countervailing considerations. We conclude that a reasonable person in appellant's position would not have felt free to terminate questioning and leave. However, we also conclude that any error in the admission of his testimony was harmless. Appellant did not directly confess, and considering the substantial evidence against him, admitting his statement did not influence the verdict.

10
(ECF No. 53-11 at 3-4.)

11
### 4.    Analysis of Ground 4

12          The NSC's application of *Chapman* and determination that admission of Bolanos's

13   statements to police was harmless beyond a reasonable doubt is objectively reasonable.

14   Bolanos argues that, although he did not confess to police or admit to involvement in the

15   murder/attempted murders, admission of his statements was prejudicial because they

16   were inconsistent with the facts presented at trial and the jury could therefore reason, "if

17   he's lying about that, he must be lying on everything, including a lack of involvement in

18   the murder itself." (ECF No. 28 at 24.) He argues that, without the statements the jury

19   would have been forced more heavily to consider the testimonies of witnesses with no

20   apparent reason to lie or shade the truth, such as Scott, Robertson and McFarland

21   (employees of FHD with no connection to Bolanos). Even without Bolanos's statements

22   about his false story, there existed direct and circumstantial evidence identifying Bolanos

23   as the shooter and of consciousness of guilt.

24          Photographs of Bolanos taken two months before the shootings depicted him

25   holding a weapon that could have fired .223 caliber ammunition. Police found .223 caliber

26   ammunition and a rifle case in the red BMW that, according to witnesses and surveillance

27   video, Bolanos drove to FHD that night, and .223 caliber ammunition casings at the scene.

28   Villagrana and Carrillo saw Bolanos, who was not a stranger to either of them, with a rifle.

1   Villagrana saw Bolanos cock the rifle and Carrillo saw him shoot at the Tahoe. Lopez

2   testified that Bolanos hit him with a gun after Lopez fled the crash. Bolanos had Lopez's

3   blood on his pants and Bolanos had a bleeding head injury. Surveillance video captured

4   Bolanos flee the scene and interact with the occupants of the silver Lexus. Hudson found

5   an AR-15 rifle in proximity to the Lexus's route. Evidence supported the State's theory

6   that Bolanos was a Norteño, i.e., his tattoos and housing classification at the jail, and the

7   motive for the shooting was gang-related, i.e., J.S.'s remarks to Lopez and evidence of

8   the victims' Sureño gang affiliation. Police apprehended Bolanos in another state, finding

9   he had grown a longer beard and covered a distinctive gray spot on his hair.

10  Fairminded jurists would not debate whether the NSC's application of *Chapman*

11  was objectively reasonable. *See Harrington,* 562 U.S. at 103. Accordingly, Ground 4 is

12  denied.

13  ### E.    Ground 5—Admission of Firearm Evidence

14  Bolanos alleges the trial court erroneously admitted (A) photographs depicting him

15  holding an AR-15 rifle, and (B) David Hudson's testimony describing, and drawing of

16  picture of, a weapon he claimed he found, in violation of due process and a fair trial under

17  the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 28 at 24-27.) Respondents argue

18  Bolanos fails to establish the NSC's application of state law violated his federal

19  constitutional rights to due process and a fair trial, or that the error, if any, had substantial

20  and injurious effect or influence in determining the jury's verdict. (ECF No. 72 at 32-36.)

21  ### 1.    Additional Background

22  Bolanos moved in limine to preclude: (1) photographs taken from Bolanos's

23  cellphone that depicted him, semi-automatic rifle(s), and individuals shooting semi-

24  automatic rifles at a shooting range; and (2) Hudson's testimony about discovering an

25  AR-15 near Mill Street and Wells Avenue in downtown Reno on the morning of the

26  shootings, and his drawing of the firearm for the police. (ECF Nos. 35-10, 35-11.)

27  Bolanos argued, among other things, the photographs were irrelevant and even if

28  relevant, the probative value is substantially outweighed by prejudice as nothing indicated

1   the weapons depicted were used for the crimes; the weapons depicted do not match

2   witness's descriptions; and, although one photograph depicts Bolanos holding what

3   appears to be an assault rifle, there are no photographs of him shooting one or evidence

4   he owned or had access to one during the offenses. (ECF No. 39-1 at 205-08, 224-25.)

5   Bolanos argued the prejudice is overwhelming because the photographs insinuate that

6   they depict the murder weapon, thereby forcing Bolanos to defend against that perception

7   "rather than putting it on the State to connect the dots . . .." (*Id.*)

8       The State argued, among other things, the photographs were relevant and

9   admissible as they depict Bolanos with a weapon that matched the witness's description

10  only weeks before the shootings and Hudson found a similar firearm. (*Id.* at 221-22.) The

11  State argued authorities cited by the defense involved evidence of weapons having

12  absolutely no connection to the crimes, i.e., evidence of a Taser where the crimes did not

13  involve a Taser and evidence of firearms purchased after the crime. (*Id.* at 223.)

14      The trial court ruled the photographs and Hudson's testimony were admissible:

15  THE COURT: [W]ith respect to the cell phone pictures of the rifle . . . taken
    close in time—relatively close in time to the shooting, depicting Mr. Bolanos
16  with a similar-type weapon, I will admit those.

17  . . . .
        But the fact that it is a rather unique firearm that is being discussed
18  by witnesses—and used—and the fact that he at least has access to a
    weapon of that type close in time to the shooting, I believe is probative, and
19  that probative value outweighs the prejudicial effect of those photos.

20  (*Id.* at 225-26.)

21              **2.    NSC's Determination**

22  The NSC rejected this claim on direct appeal:

23  *Firearm evidence*

24          Appellant contends that the district court erred by permitting the State
    to introduce evidence regarding an assault rifle. Prior to trial, the defense
25  sought to exclude (1) evidence that appellant purchased an assault rifle, (2)
    pictures of appellant holding an assault rifle, and (3) the testimony of David
26  Hudson, who claimed he found an assault rifle in an empty lot. Appellant
    asserted that the evidence was irrelevant because the State was unable to
27  prove that the rifle was the one used in the crime, and was therefore being
    used as propensity evidence. The district court allowed the State to
28

39

1
2
3
4
5

introduce the photographs of appellant and Hudson's testimony. We conclude that the district court did not abuse its discretion because the evidence was relevant and was not substantially more unfairly prejudicial than probative. *See* NRS 48.015; NRS 48.025; NRS 48.035; *see also Castillo v. State,* 114 Nev. 271, 277, 956 P.2d 103, 107-08 (1998) ("District courts are vested with considerable discretion in determining the relevance and admissibility of evidence.").

6

(ECF No. 53-11 at 6.)

7

### 3.    Analysis of Ground 5

8   As explained in the discussion of Ground 1, the Supreme Court "has not yet made
9   a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due
10  process violation sufficient to warrant issuance of the writ [of habeas corpus]." *Holley*, 568
11  F.3d at 1101. And Bolanos points to no clearly established federal law as determined by
12  the Supreme Court that addresses this issue. Therefore, the state court's decision on this
13  issue cannot be contrary to or an unreasonable application of federal law. *See Wright*,
14  552 U.S. at 125-26; *Carey*, 549 U.S. at 77.

15  Insofar as this is a claim that admission of the evidence violated due process, the
16  NSC could reasonably conclude the firearm evidence was relevant and did not render the
17  trial fundamentally unfair as it was not of such a quality as necessarily prevented a fair
18  trial in violation of federal due process. *See Harrington*, 562 U.S. at 102. The jury could
19  draw reasonable inferences from the photographs together with the ammunition fired at
20  the scene, and ammunition found in the red BMW, that Bolanos had familiarity with, and
21  immediate access to, the type of weapon used for the crimes.

22  The jury could also draw reasonable inferences the weapon Hudson found was
23  the weapon used for the crimes. Hudson was familiar with weapons and discovered an
24  AR-15 that could fire .223 caliber ammunition, the type found at the scene and in the red
25  BMW. He found it near the intersection of Mill Street and Wells Avenue in downtown
26  Reno, which is consistent with RPD Officer Coffey's testimony that he spotted the Lexus
27  on Mill Street and Locust, which is just one block away from Mills Street and S. Wells
28  Avenue. (ECF No. 42-1 at 257-58.) Villagrana, Carrillo, and Lopez each testified they saw

40

1   Bolanos with a rifle/gun. Even assuming surveillance of Officer Hakin and the RPD, as

2   well as the testimony of the FHD security guards, convinced a jury that Bolanos was not

3   the runner with the firearm, it was for the jury to determine, and inferences from the

4   evidence could be drawn, that the rifle was deposited in the Lexus and disposed of

5   between the interaction with Bolanos in front of RPD and before Coffey spotted the Lexus.

6   Given the permissible inferences to be drawn from the evidence, and the relevance of the

7   evidence, it is reasonable to conclude the admission of the photographs and Hudson's

8   testimony and drawing was not fundamentally unfair.

9        The NSC's determination was neither contrary to nor constitutes an unreasonable

10  application of clearly established federal law as determined by the Supreme Court and is

11  not based on an unreasonable determination of fact, Ground 5 is denied.

12       **F.    Ground 6—Instruction on Immunized Testimony**

13       Bolanos alleges the trial court refused to instruct the jury advising caution in

14  considering Hudson's credibility in violation of due process and a fair trial under the Fifth,

15  Sixth, and Fourteenth Amendments. (ECF No. 28 at 27-30.) Respondents contend the

16  NSCs' rejection of this claim is not unreasonable as there is no evidence that Hudson

17  was provided immunity. (ECF No. 72 at 36-40.)

18       **1.    Additional Background**

19       Hudson testified he was a convicted felon when police arrested him for a

20  misdemeanor warrant. (ECF No. 45-2 at 23, 33-34, 41.) To avoid jail, he told Detective

21  Ferguson about having found an AR-15 firearm near an alley off Mill Street on the morning

22  of the shootings, and Ferguson kept Hudson out of jail on the warrant in exchange for

23  that information. (*Id.* at 10-22, 40-41, 44-45, 66-67.) Hudson was high on

24  methamphetamine and had it on his person when he gave his statement to Ferguson, but

25  the police did not know Hudson had it. (*Id.* at 54, 63.) He believed that if he was arrested

26  and booked into jail, they would find it on his person and charge him with possession or

27  purchase of methamphetamine. (*Id.* at 62-63.) Hudson was not arrested for having been

28  an ex-felon in possession of a firearm, being under the influence of methamphetamine,

1   or possession or purchase of methamphetamine. (*Id.* at 60-61.) At trial, Hudson was on

2   probation for unrelated activity in a case acquired after his statements to police; aside

3   from the requirement he not break the law, e.g., by committing perjury, probation was not

4   conditioned upon his testimony. (*Id.* at 62, 70-71.)

5        Bolanos proposed an instruction for Hudson's testimony as an immunized witness:

6            The testimony of an immunized witness, that is, someone who has
7        been told either that his crimes will go unpunished in return for testimony or
         that his testimony will not be used against him in return for that cooperation
8        with the State, must be examined and weighed by the jury with greater care
         than the testimony of someone who is appearing in court without the need
9        for such an agreement with the State[.] David Hudson may be considered
         t[o] be an immunized witness in this case.
10
11           The jury must determine whether the testimony of an immunized
         witness has been affected by self-interest, or by the agreement he has with
12       the State, or by his own interest in the outcome of this case, or by prejudice
         against the Defendant.

13   (ECF Nos. 48-2 at 3; 49-2 at 58.)

14        The trial court noted "[w]e don't have any testimony of immunity" and the proposed

15   instruction "says 'for cooperation with the State,'" but "he doesn't have an agreement with

16   the State." (ECF No. 48-3 at 58, 67-68.) The defense argued "he was given consideration

17   for his statements, the testimony, in the sense that he was not taken in on the warrant."

18   (*Id.* at 60.) The State confirmed it provided Hudson no immunity and emphasized it had

19   no agreement for his testimony. (*Id.* at 58, 65-66.) The defense argued Hudson knew he

20   had drugs on him and knew he couldn't go up to the jail with it because they would find it

21   so "[h]e was going to do anything he could to stay out of the jail setting. And in return for

22   this statement, he was allowed to do so." (*Id.* at 64.) The trial court stated it would not

23   give the immunized witness instruction because there is no evidence of immunity. (*Id.* at

24   67-68.) The trial court offered to modify the general instruction on credibility to include a

25   provision to consider "whether a witness received anything of value in exchange for

26   testimony," but the State objected as there was no agreement for Hudson's testimony.

27   (*Id.* at 65-69.) Defense counsel revised the proposed instruction:

28           The testimony of a witness, who has been told either that his crimes

                                    42

will go unpunished in return for testimony or that his testimony will not be used against him in return for that cooperation with the State, must be examined and weighted by the jury with greater care than the testimony of someone who is appearing in court without the need for such an agreement with the State. David Hudson may be considered to be such a witness in this case.

The jury must determine whether the testimony of such a witness has been affected by self-interest, or by the agreement he has with the State, or by his own interest in the outcome of the case, or by prejudice against the Defendant.

(ECF Nos. 48-2 at 5, 49-2 at 68.) The State again objected as there was no exchange for Hudson's testimony. (*Id.*) Defense counsel asked the trial court about modifying the general believability instruction and the trial court declined to modify it because it would not satisfy the defense's concerns, and it gave neither of the defense's proposed instructions. (ECF No. 49-2 at 68-69, 75.)

The jury was instructed on determining the credibility of witnesses:

To the jury alone belongs the duty of weighing the evidence and determining the credibility of the witnesses. The degree of credit due a witness should be determined by his or her character, conduct, manner upon the stand, fears, bias, impartiality, reasonableness or unreasonableness of the statements he or she makes, and the strength or weakness of his or her recollections, viewed in the light of all the other facts in evidence.

If the jury believes that any witness has willfully sworn falsely, they may disregard the whole of the evidence of any such witness.

(ECF No. 48-3 at 40.)

In closing, the defense argued Hudson lacked credibility because he had methamphetamine on his person and traded his way out of jail on the warrant with the information about the rifle. (*Id.* at 182-83.)

## 2.    Legal Principles

The Supreme Court has stated "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are 'dirty business' may raise serious questions of credibility" and "[t]o the extent that they do, a defendant is entitled to broad

1    latitude to probe credibility by cross-examination and to have the issues submitted to the

2    jury with careful instructions." *On Lee v. United States*, 343 U.S. 747, 757 (1952). "This

3    passage is not a command that a specific jury instruction be given if an accomplice or

4    informant testifies, but rather is an explanation of the Supreme Court's decision to

5    categorize matters of credibility as questions of weight, not admissibility." *Goff v. Bagley*,

6    601 F.3d 445, 470 n.14 (6th Cir. 2010).

7            "An appraisal of the significance of an error in the instructions to the jury requires

8    a comparison of the instructions which were actually given with those that should have

9    been given." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "An omission, or an

10   incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Id.*

11   at 155. A federal habeas court must determine "'whether the ailing instruction by itself so

12   infected the entire trial that the resulting conviction violates due process." *Id.* at 154

13   (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). This standard also applies to

14   omitted instructions. *See id.* at 155; *Murtishaw v. Woodford*, 255 F.3d 926, 971 (9th Cir.

15   2001). Federal habeas relief is not available for an alleged error in the interpretation or

16   application of state law.[12] *Estelle*, 502 U.S. at 67-68 (reiterating "it is not the province of

17   a federal habeas court to reexamine state-court determinations on state-law questions").

18                    **3.    NSC's Determination**

19           On direct review, the NSC determined the instruction Bolanos requested was

20   inapplicable as there was no showing Hudson expected a benefit from his trial testimony:

21       *Jury instruction*

22           Appellant contends that the district court abused its discretion by
         denying his request for a "distrust" or "addict/informer" instruction regarding
23       Hudson's testimony. *See Champion v. State,* 87 Nev. 542, 544, 490 P.2d
         1056, 1057 (1971). However, below appellant requested an instruction
24       stating that the jury should carefully examine someone who expects to

25   _____

26       [12]In Nevada, a "distrust" instruction "is required when an informant's testimony is
     uncorroborated and favored when the testimony is corroborated in critical respects."
27   *Buckley v. State*, 600 P.2d 227, 228 (Nev. 1979). By contrast, when the State "adduces
     testimony by an addict-informer," "the defendant is entitled to careful instructions
28   cautioning the jury 'of the care which must be taken in weighing such testimony.'"
     *Champion v. State*, 490 P.2d 1056, 1057 (Nev. 1971).

                                                44

receive a benefit in exchange for his trial testimony. That instruction was inapplicable because appellant did not demonstrate that Hudson expected to receive a benefit for his trial testimony. Appellant did not request the instruction he discusses on appeal and fails to demonstrate that the district court committed plain error, *see King v. State,* 116 Nev. 349, 355, 998 P.2d 1172, 1176 (2000) (distinguishing *Champion),* particularly given the overwhelming evidence and the other credibility instructions given at trial.

(ECF No. 53-11 at 6-7.)

### 4.    Analysis of Ground 6

Bolanos argues the NSC's decision is based on an unreasonable determination of fact, i.e., he "did not request the instruction he discusses on appeal." Bolanos is correct that the NSC mischaracterized the claim raised on direct appeal when it stated he claimed the trial court erred by failing to give a distrust instruction for an "addict/informer." In his appeal, Bolanos did not argue the court erred by failing to provide an "addict/informer" instruction; he instead argued the trial court should have given either the instruction for an immunized witness or the defense's proposed modified instruction that took out references to immunization and referred only to "cooperation" with the State in exchange for testimony. (ECF Nos. 53-1 at 74-77, 53-9 at 23-24.) This Court's review is nonetheless deferential because the NSC alternatively concluded the claim that Bolanos preserved at trial (and which was the claim he raised on appeal) lacked merit as Bolanos did not show Hudson received a benefit for his trial testimony.

Bolanos has cited no clearly established federal law as determined by the Supreme Court that requires either of the instructions he proposed at trial. To the extent Bolanos contends the failure to give the jury instruction was error as a matter of Nevada law, his claim is not cognizable on federal habeas review. *See Estelle*, 502 U.S. at 71-72. Bolanos has also not established the trial court's failure to give either proposed instruction so infected the entire trial that the resulting conviction violates due process. Each of the defense's proposed instructions to the jury concerned Hudson's benefits in exchange for testimony. But Hudson was neither given immunity from prosecution nor a benefit in exchange for his trial testimony. Assuming arguendo it could be reasonably inferred

1   Hudson's arrangement required he testify to the information he provided to Ferguson,

2   Bolanos did not establish failure to provide the instructions to the jury infected the entire

3   trial such that the resulting conviction violated due process. The jury was fully apprised of

4   the benefits Hudson derived from his information to Ferguson. *See supra*.

5          Ground 6 is denied because the NSC's determinations are neither contrary to nor

6   constitute an unreasonable application of clearly established federal law as determined

7   by the Supreme Court and is not based on an unreasonable determination of fact

8   considering the evidence presented in the state court proceedings.

9       **G.    Ground 7—IAC—Failure to Move for Rehearing**

10         Bolanos alleges he received ineffective assistance of appellate counsel in violation

11  of the Fifth, Sixth, and Fourteenth Amendments due to appellate counsel's failure to move

12  under Nev. R. App. P. 40(a) for rehearing of the claim raised in Ground 1 following the

13  decision in *Gonzalez v. State*, 366 P.3d 680 (Nev. 2015). (ECF No. 28 at 30-31.)

14  Respondents argue the NSC reasonably concluded counsel was not ineffective. (ECF

15  No. 72 at 40-42.)

16         The NSC concluded counsel was not ineffective as rehearing based on the

17  decision in *Gonzalez* was futile:

18         To prove ineffective assistance of counsel, a petitioner must
19  demonstrate that counsel's performance was deficient in that it fell below
    an objective standard of reasonableness, and resulting prejudice such that
20  there is a reasonable probability that, but for counsel's errors, the outcome
    of the proceedings would have been different. *Strickland v. Washington,*
21  466 U.S. 668, 687-88 (1984); *Warden v. Lyons,* 100 Nev. 430, 432-33, 683
    P.2d 504, 505 (1984) (adopting the test in *Strickland*); *see Kirksey v. State,*
22  112 Nev. 980, 998, 923 P.2d 1102, 1113-14 (1996) (applying *Strickland* to
    appellate-counsel claims). Both components of the inquiry must be shown,
23  *Strickland,* 466 U.S. at 697, and the petitioner must demonstrate the
    underlying facts by a preponderance of the evidence, *Means v. State,* 120
24  Nev. 1001, 1012, 103 P.3d 25, 33 (2004). When a postconviction petition
    raises claims supported by specific factual allegations which, if true, would
25  entitle the petitioner to relief, the petitioner is entitled to an evidentiary
    hearing unless those claims are repelled by the record. *Hargrove v. State,*
26  100 Nev. 498, 503, 686 P.2d 222, 225 (1984).

27         [A]ppellant argues that evidence about his gang involvement was
28  erroneously admitted. Appellant relies on this court's decision in *Gonzalez*

1
2
3
4
5
6
7
8
9
10
11
12
*v. State,* 131 Nev. 991, 366 P.3d 680 (2015), which reversed a conviction because the trial court did not bifurcate consideration of a gang enhancement from the guilt phase of trial. Because this court considered and rejected this argument on appeal, *Bolanos v. State,* Docket No. 65622 Order of Affirmance at 4 (Nov. 24, 2015), the doctrine of the law of the case precludes reconsideration unless appellant demonstrates a substantive change in law applicable to his case, *Hsu v. County of Clark,* 123 Nev. 625, 632, 173 P.3d 724 (2007); *Hall v. State,* 91 Nev. 314, 315, 535 P.2d 797, 798 (1975); *see also* NRS 34.810(1)(b)(2) (waiver bar). Here, the *Gonzalez* decision did not substantively change the law regarding the admission of gang evidence. In fact, *Gonzalez* specifically approved of the admission of gang affiliation evidence to show motive—the purpose for which it was introduced during Bolanos' trial. *Gonzalez,* 131 Nev. at 1002-03, 366 P.3d at 687-88; *Bolanos,* Docket No. 65622, Order of Affirmance at 4. To the extent that appellant claimed his appellate counsel should have filed a petition for rehearing based on *Gonzalez,* we conclude that appellant did not allege sufficient facts to demonstrate deficient performance or prejudice because, as noted above, such an argument would have been futile. *See Ennis v. State,* 122 Nev. 694, 706, 137 P.3d 1095, 1103 (2006). Accordingly, the district court did not err in denying this claim without conducting an evidentiary hearing.

13
(ECF No. 56-29 at 2-3.)

14
15
16
17
18
19
20
21
22
As the NSC explained, in *Gonzalez,* the NSC reaffirmed that evidence of gang affiliation is admissible in Nevada for the purpose of showing motive. *See Gonzalez v. State*, 366 P.3d 680, 687 (Nev. 2015) (citing *Butler v. State*, 102 P.3d 71, 78 (Nev. 2004) ("This court has repeatedly held that gang-affiliation evidence may be relevant and probative when it is admitted to prove motive.")).[13] Seeking relief based on *Gonzalez* was futile. The NSC had already decided the gang affiliation evidence against Bolanos was admissible to establish his motive for the shootings. Moreover, *Gonzalez* is distinguishable because, unlike in Bolanos's case, the decision in *Gonzalez* concerned the use of gang evidence during a guilt phase of a trial solely for the purpose of proving

23

24
25
26
27
28
---
[13]The NSC previously held that bifurcation of the presentation of gang enhancement evidence from the guilt phase of the trial is mandatory. *See Brown v. State,* 967 P.2d 1126, 1131 (Nev. 1998) (holding that severance is mandatory in multicount indictments where one count is of possession of a firearm by an ex-felon); *see also Morales v. State,* 143 P.3d 463, 465 (Nev. 2006) (holding that bifurcation procedure accomplishes the same policy goals as the severance mandated in *Brown*). In *Gonzalez,* the NSC held that evidence of gang involvement may not be admitted during a guilt phase of a trial solely for the purpose of proving a gang enhancement. 366 P.3d at 687.

1    an alleged gang enhancement. *See id.*

2        Ground 7 is denied because it was objectively reasonable to conclude counsel's

3    failure to seek rehearing under *Gonzalez* was neither deficient nor prejudicial.

4            **H.    Ground 8—IAC—Failure to Hire Gang Expert**

5        Bolanos alleges trial counsel was ineffective in violation of the Fifth, Sixth, and

6    Fourteenth Amendments, for failing to investigate and hire an expert concerning the gang

7    structure in Carson, City, Nevada. (ECF No. 28 at 31-32.) He claims an investigation into

8    the gang structure in Carson City and/or testimony of a gang expert would have revealed

9    Bolanos was not an active gang member. (*Id.*) He argues an expert could have testified

10   about the true meaning of the Huelga tattoo and explain that it was not gang-related, the

11   Huelga "represents nationalism in Mexico and the struggles of the Mexican American"

12   and the GUN tattoo "stood for the Generation of United Nationals." (*Id.*) Respondents

13   contend that, given counsel's cross-examination of the State's gang expert, and

14   Bolanos's failure to identify a gang expert or information that trial counsel did not address

15   during that cross-examination, Bolanos fails to demonstrate every reasonable trial

16   attorney would have retained a gang expert under the circumstances, or prejudice given

17   the strength of the State expert's opinion and evidence of guilt. (ECF No. 72 at 42-45.)

18       In state postconviction proceedings, the NSC concluded Bolanos alleged

19   insufficient facts to establish counsel's performance was deficient or demonstrate

20   prejudice given the strength of the State expert's opinion and substantial evidence of guilt:

21           [A]ppellant argues that trial counsel should have introduced gang
         expert testimony to refute testimony about appellant's gang association and
22       attribute different meaning to his tattoos. Counsel alone has the ultimate
         responsibility of deciding which witnesses to develop, *Rhyne v. State,* 118
23       Nev. 1, 8, 38 P.3d 163, 167 (2002), and appellant has not alleged sufficient
         facts to overcome the presumption that counsel acted reasonably, *see*
24       *Strickland,* 466 U.S. at 690 (providing that counsel is strongly presumed to
         have exercised reasonable professional judgment). Because the most
25       persuasive evidence of appellant's gang membership was his own
         admission made during a field interview, appellant did not demonstrate that
26       counsel performed deficiently in not introducing expert testimony to suggest
         otherwise. Appellant also failed to demonstrate prejudice given the strength
27       of the expert's opinion and the substantial evidence of guilt. The State's
28

                                        48

expert's opinion was undermined by his acknowledgments that appellant's tattoos could have other significance besides gang membership, some of his tattoos were inconsistent with Norteño gang membership, and that the shooting itself did not appear to be a "gang-type hit-up." Additionally, appellant was identified by two witnesses, who were already familiar with him and who observed him with a rifle near the time that shots were fired. The car in which he travelled to the scene contained an empty rifle case and ammunition. Appellant's clothing was stained with one of the victim's blood. A rifle magazine, cartridge, and appellant's shirt were recovered from a vehicle he had been seen interacting with. Photos on appellant's phone indicated that he possessed a firearm similar to the one used in the shooting. He was later arrested in California after giving a false name and changing his appearance. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

(ECF No. 56-29 at 4-5.)

The NSC's determinations are objectively reasonable. Bolanos failed to allege facts to overcome the presumption that trial counsel's performance fell within the wide range of reasonable professional assistance, i.e., that counsel's failure to hire a gang expert and investigate Bolanos's gang membership might be considered sound trial strategy. Bolanos argues the failure to hire a gang expert was not a reasonable strategic decision as counsel failed to inform that decision by first investigating whether a gang expert could be helpful to the defense. Bolanos has not demonstrated counsel would have learned anything useful to the defense by doing so. Moreover, hiring a gang expert was not the only reasonable defense strategy. Counsel elicited Crow's admissions that Crow (1) never interviewed Bolanos to confirm he was a Norteño; (2) relied on a field interview of Gustavo; not Bolanos; (3) Bolanos's tattoos could have non-gang related meanings; and (4) the shooting did not appear to be a "typical gang-type hit-up." (*Id.* at 8-20.) Moreover, Bolanos fails to show a gang expert could conclusively establish Bolanos was not a gang member or that the evidence of his gang-affiliation was false, i.e., the GangNET data base entry and statements for his classification at the jail.

Ground 8 is denied as Bolanos fails to establish the NSC's determinations are contrary to or constitute an unreasonable application of clearly established federal law as determined by the Supreme Court or are based on an unreasonable determination of fact.

49

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### I.    Ground 9—State's Failure to Disclose Impeachment Evidence

Bolanos alleges the State violated his rights under the Fifth, Sixth, and Fourteenth Amendments by failing to disclose, as impeachment evidence, sentencing consideration for Lopez, under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). (ECF No. 28 at 33-36.) Respondents contend Bolanos fails to establish a *Brady* violation. (ECF No. 72 at 45-48.)

#### 1.    Additional Background

On November 20, 2013, in an unrelated matter, Lopez agreed to plead guilty in Carson City to Attempted Battery with a Deadly Weapon Resulting in Substantial Bodily Harm. (ECF No. 53-14 at 17-25.) Lopez faced imprisonment for not less than one year and not more than ten years and was not promised a particular sentence. (*Id.* at 18-19.)

During Bolanos's trial, Lopez testified he pleaded guilty to Attempted Battery with a Deadly Weapon, was to be sentenced in Carson City in a couple of weeks, and faced prison but could be sentenced to probation. (ECF No. 44-1 at 154-56, 192.) He said his negotiations in his Carson City case were not contingent on his testifying in Bolanos's case, the crime involved in his own case was committed two years before trial, and the State subpoenaed him for Bolanos's trial after he pleaded guilty in Carson City. (*Id.* at 156, 193-94, 221-22.) Lopez denied hoping that if he did something good the Washoe County District Attorney's office for Bolanos's case would contact the Carson City District Attorney. (*Id.*) Lopez admitted he did not initially identify Bolanos as having a gun on the night of the shootings, but denied his impending sentencing caused him to change his story and testify that Bolanos hit him with a gun. (*Id.* at 200-04, 210.)

After the verdict in Bolanos's case, sentencing in Lopez's Carson City case was continued because Lopez's counsel for the Carson City case was "waiting for correspondence/letter for submission to the Carson City District Attorney from the Washoe County District Attorney regarding the defendant's substantial cooperation in a Washoe County case." (ECF No. 53-14 at 30-32.) Lopez later submitted for his sentencing a letter from the Washoe County District Attorney about Lopez's testimony in Bolanos's case. (*Id.* at 34-35.) The letter states "[n]o promises were made to Mr. Lopez

1   in exchange for his testimony in the State's case. To the contrary, he was expressly told

2   that his testimony was immaterial to his pending sentencing." (*Id.*) Lopez was sentenced

3   to 40 to 102 months imprisonment. (*Id.* at 37.)

4               **2.      Standards for Evaluating *Brady* Obligations**

5           The suppression by the prosecution of evidence favorable to an accused violates

6   due process where the evidence is material either to guilt or punishment, irrespective of

7   the good faith or bad faith of the prosecution. *See Brady*, 373 U.S. at 87. The prosecution

8   is required to produce material exculpatory and impeachment evidence to the defense

9   whether the defense requests such evidence. *See Strickler v. Greene*, 527 U.S. 263, 280

10  (1999) (citing *United States v. Agurs*, 427 U.S. 97 (1976) and *United States v. Bagley*,

11  473 U.S. 667, 676 (1985)). "When the 'reliability of a given witness may well be

12  determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls

13  within this general rule." *Giglio v. United States*, 405 U.S. 150, 154-55 (1972) (quoting

14  *Napue v. People of State of Ill.*, 360 U.S. 264, 269 (1959)).

15          A *Brady* prosecutorial misconduct claim has three essential elements: (1) evidence

16  at issue is favorable because it is exculpatory or impeaching; (2) the State suppressed

17  that evidence either willfully or inadvertently; and (3) the evidence was material and

18  therefore suppression of it resulted in prejudice. *See Banks v. Dretke*, 540 U.S. 668, 691

19  (2004) (citing *Strickler*, 527 U.S. at 281-82). "Any evidence that would tend to call the

20  government's case into doubt is favorable for *Brady* purposes." *Milke v. Ryan*, 711 F.3d

21  998, 1012 (9th Cir. 2013) (citing *Strickler*, 527 U.S. at 290). Suppression is "[t]he willful or

22  inadvertent failure of the prosecutor to disclose evidence favorable to the defendant." *Id.*

23  at 1016 (citing *Strickler*, 527 U.S. at 281-82 and *Giglio*, 405 U.S. at 154 ("[W]hether the

24  nondisclosure was a result of negligence or design, it is the responsibility of the

25  prosecutor.")). Evidence is material "if there is a reasonable probability that, had the

26  evidence been disclosed to the defense, the result of the proceeding would have been

27  different." *Strickler*, 527 U.S. at 290 (citing *Bagley*, 473 U.S. at 682 and *Kyles v. Whitley*,

28  514 U.S. 419, 433-434 (1995)). The question "[i]s not whether the defendant would more

likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289-90. On the other hand, "'[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.'" *Agurs*, 427 U.S. at 109-10). *See also Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (acknowledging that granting a writ of habeas corpus "on the basis of little more than speculation with slight support" is improper). Moreover, evidence impeaching a witness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. *See Smith v. Cain*, 565 U.S. 73, 76 (2012) (finding that was not the case when a witness's testimony was the only evidence linking the defendant to the crime).

"Evidence of a deal or promise of lenient treatment in exchange for a witness's testimony against a defendant may constitute evidence that must be disclosed under *Brady* and *Napue*." *Hovey v. Ayers*, 458 F.3d 892, 916-17 (9th Cir. 2006) (citing *Giglio*, 405 U.S. at 154-55). "The deal or promise need not be express; failure to disclose an agreement or guarantee of leniency 'indicated without making a bald promise' also may violate *Brady*." *Id.* (quoting *United States v. Butler*, 567 F.2d 885, 888 n.4 (9th Cir. 1978)). *See also United States v. Shaffer*, 789 F.2d 682, 689 (9th Cir. 1986) (finding *Brady* violation where the evidence "implies that a tacit agreement was reached between [a witness] and the government that allowed [the witness] to avoid any asset forfeiture liability in exchange for his cooperation."). "However, in the absence of a promise or deal, a witness's subjective belief that he might receive lenient treatment in exchange for testifying does not render perjurious his testimony that he received no promises that he would benefit from testifying." *Id.*

### 3.    NSC's Determination

During the state postconviction proceedings, the NSC determined the State did not possess and withhold information favorable to Bolanos because the documents do not support an inference that Lopez was promised leniency in exchange for his testimony:

[A]ppellant argues the State violated *Brady v. Maryland,* 373 U.S. 83 (1963), by withholding evidence that a victim's testimony was obtained in connection with a promise of a favorable sentencing recommendation from the Washoe County District Attorney. He also asserts that appellate counsel should have argued that the State violated *Brady.* There are three components to a successful *Brady* claim: "the evidence at issue is favorable to the accused; the evidence was withheld by the state, either intentionally or inadvertently; and prejudice ensued, i.e., the evidence was material." *Mazzan v. Warden,* 116 Nev. 48, 67, 993 P.2d 25, 36-37 (2000). Appellant did not demonstrate that the State possessed evidence favorable to him. The documents supporting this claim were not generated until after the witness testified; thus, they could not be used during cross-examination. Moreover, the documents do not support an inference that the witness was promised any consideration regarding his pending case based on his testimony at appellant's trial. As appellant failed to demonstrate a meritorious *Brady* claim, he failed to demonstrate that appellate counsel performed deficiently. Therefore, the district court did not err in denying this claim.

(ECF No. 56-29 at 5.)

### 4.     Analysis of Ground 9

The NSC's determination that the State did not possess evidence favorable to Bolanos and "the documents do not support an inference that the witness was promised any consideration regarding his pending case based on his testimony at appellant's trial," is objectively reasonable. At trial, Lopez denied he expected to receive a benefit by testifying. The District Attorney's letter for Lopez's Carson City case denied a cooperation arrangement as it stated: "[n]o promises were made to Mr. Lopez in exchange for his testimony in the State's case. To the contrary, he was expressly told that his testimony was immaterial to his pending sentencing." Thus, the record shows the prosecution did not, before Bolanos's trial, offer leniency in exchange for Lopez's testimony at Bolanos's trial. Accordingly, the NSC reasonably concluded the State did not possess information favorable to Bolanos or fail to disclose it as required by *Brady*.

Because the NSC's determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings, Ground 9 is denied.

### J.    Ground 10—IAC—Failing to allege *Brady* violation on appeal.

Bolanos alleges appellate counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth Amendments by failing to allege the *Brady* violation set forth in Ground 9. (ECF No. 28 at 36.) Respondents contend that appellate counsel's failure to raise a meritless argument does not constitute deficient performance and fails to demonstrate prejudice. (ECF No. 72 at 48-49.) The NSC determined that because Bolanos "failed to demonstrate a meritorious *Brady* claim," he likewise "failed to demonstrate that appellate counsel performed deficiently" by failing to raise the claim on appeal. *See supra* at p. 53. For the reasons discussed in Ground 9, i.e., the NSC reasonably concluded the *Brady* claim lacked merit, Bolanos fails to establish appellate counsel's failure to raise the *Brady* claim fell below an objective standard of reasonableness. Because the NSC's application of *Strickland*'s deficiency prong was objectively reasonable and is not based on an unreasonable determination of the facts considering the evidence presented in the state court proceedings, Ground 10 is denied.

### K.    Ground 11—IAC—Failure to call Eyewitness and Ballistics Experts

Bolanos alleges trial counsel was ineffective for failing to call experts regarding: (A) the reliability of eyewitness testimony; and (B) ballistics. (ECF No. 28 at 37-40.)

#### 1.    Ground 11(A)—Eyewitness Identification[14]

Trial counsel noticed an intent to call Dr. Deborah Davis to testify as to the reliability of certain eyewitness identifications of Bolanos as the gunman and shooter and statements made by witnesses under duress. (ECF No. 35-7 at 3.) Bolanos intended to present Davis's testimony about "areas of eyewitness identification testimony," including "poor lighting; possible intoxication; stress of a sudden event; cross-cultural issues; [and] the effect of post-event information." (ECF No. 36-11 at 7.) The State moved in limine to exclude Davis's testimony. (ECF No. 36-3.) The trial court expressed its intent to deny the motion and allow the expert's testimony. (ECF No. 39-1 at 183-184, 186.)

---

[14]For clarity the Court subdivides Ground 11.

Near the close of the prosecution's case, defense counsel had not decided whether to call Davis "due to logistics, and timing," and counsel did not know if the expert would be available if trial spilled over to the next week. (ECF No. 48-1 at 154-55.) The trial court warned they had to deliver the case to the jury the next day. (*Id.* at 156.)

Later that day, defense counsel informed the trial court he decided not to call the experts "based on a number of things" that had nothing to do with the court's timing:

> [DEFENSE COUNSEL]: [W]e made the decision at lunch on tactical logistics—well, actually timing logistics, as far as two experts. We're not going to call them because I understand we want to get the case to the jury Friday. I think enough has been said.
> . . . .
> [THE COURT: [A]ctually—I'm sorry—before we clear, I just want to make sure because I have to rewind and reply this with respect to whom you intend to call tomorrow, I'm not denying you the opportunity to call any experts that you feel is appropriate in this matter. I'm just saying that tomorrow may be a long day. I'm just letting everybody settle in. You can have all the time—
>
> [DEFENSE COUNSEL]: Your Honor, I want the record to be clear the Court has nothing to do with that. We've made the decision, based on a number of things.

(ECF No. 47-1 at 89, 91-92.)

The trial court instructed the jury on determining credibility of witnesses, *see supra* at p. 43, and on factors for consideration of eyewitness testimony:

> You have heard testimony of eyewitness identification. In deciding how much weight to give to this testimony, you may consider the various factors mentioned in these instructions concerning credibility of witnesses.
>
> In addition to those factors, in evaluating eyewitness identification testimony, you may consider:
>
> (1) the capacity and opportunity of the eyewitness to observe the offender based upon the length of time for observation and the conditions at the time of the observation, including lighting and distance;
>
> (2) whether the identification was the product of the eyewitness's own recollection or was the result of subsequent influence or suggestiveness;
>
> (3) any consistent identifications made by the eyewitnesses;

(4) the witness's familiarity with the subject identified;

(5) the strength of earlier and later identifications;

(6) lapses of time between the event and the identification[s]; and

(7) the totality of circumstances surrounding the eyewitness's identification.

(ECF No. 48-3 at 41.)

During state postconviction proceedings, the NSC determined that darkness, stress, and intoxication are matters of common sense; it was not unreasonable to forgo expert testimony on cross-cultural and post-event information and instead argue the eyewitness' identifications were unreliable due to inconsistent descriptions of physical features and the conditions under which witnesses observed the suspects; and that Bolanos was not prejudiced by failure to call the expert:

> [A]ppellant contends that trial counsel should have presented testimony from Dr. Deborah Davis, who would have testified that eyewitness accounts were inherently unreliable based on poor lighting, intoxication, stress, cross-cultural issues, and post-event information. Near the end of trial, counsel declined to call Dr. Davis, concluding that other testimony was sufficient. Appellant failed to overcome the presumption that this decision was reasonable. *See Strickland,* 466 U.S. at 690 (providing that counsel is presumed to have exercised reasonable professional judgment); *Lara v. State,* 120 Nev. 177, 180, 87 P.3d 528, 530 ("[C]ounsel's strategic or tactical decisions will be virtually unchallengeable absent extraordinary circumstances."). The fact that darkness, stress, and intoxication may cast doubt on the certainty of an identification is a matter of common sense and therefore did not require specialized testimony to understand. *See United States v. Raymond,* 700 F. Supp. 2d 142, 150 (D. Me. 2010) (recognizing that expert witness testimony about matters of common sense "invites a toxic mixture of purported expertise and common sense"); *see also Townsend v. State,* 103 Nev. 113, 117, 734 P.2d 705, 708 (1987) (recognizing that expert testimony is admissible when "the expert's *specialized knowledge* will assist the trier of fact to understand the evidence or determine a fact in issue" (emphasis added)). While expert testimony about the effect of cross-cultural issues and post-event information may have been admissible, it was not unreasonable for trial counsel to forgo this testimony and instead argue that the eyewitness' identifications were unreliable based on inconsistent descriptions of physical features and the conditions in which the witnesses observed the suspects. Appellant further failed to demonstrate prejudice given the aforementioned evidence of guilt. Therefore, the district court did not err in denying this claim without

56

1    conducting an evidentiary hearing.

2    (ECF No. 56-29 at 5-6.)

3    The NSC was objectively reasonable in its determination that trial counsel's

4    decision to forgo calling Davis did not fall below an objective standard of reasonableness

5    under the circumstances. The trial court instructed the jury concerning factors to consider

6    in assessing the credibility of witnesses and the reliability of eyewitness identifications.

7    Counsel elicited on cross-examination information relevant to those factors and the

8    prospect that, although Bolanos was no stranger to Villagrana and Carrillo, they

9    assembled their story with others after the shootings and had motivations for identifying

10    Bolanos born out of bias against the Bolanos family's supposed involvement in the

11    prosecution of Carrillo's brother for shooting Bolanos's friend, Garcia. (ECF No. 46-1 at

12    99-102, 221-223.) Counsel exposed Lopez's inconsistent story about whether he saw

13    Bolanos with a gun. And testimony at trial exposed factors affecting the testimony of all

14    the eyewitnesses, including poor lighting, intoxication, stress of a sudden event, and the

15    effect of post-event information as it pertains to the reliability of the eyewitness testimony.

16    Defense counsel did not examine the witnesses about cross-cultural issues, but there is

17    no indication it was a factor that could have affected the reliability of the testimony.

18    Given counsel's objectives for Davis's testimony, cross-examination of the

19    eyewitnesses, other evidence concerning the circumstances affecting the reliability of the

20    identifications, and instructions given to the jury, the NSC reasonably determined

21    counsel's failure to call Davis to testify and instead argue that the eyewitness testimony

22    was unreliable did not fall below an objective standard of competence under prevailing

23    professional norms. Because the NSC's determination is neither contrary to nor

24    constitutes an unreasonable application of *Strickland*'s performance prong and is not

25    based on an unreasonable determination of fact considering the evidence presented

26    during the state court proceedings, Ground 11(A) is denied.

27    **2.    Ground 11(B)—Ballistics Expert**

28    Trial counsel noticed an intent to call Lance Martini to testify as an expert on

ballistics, trajectory, and firearms. (ECF No. 35-7 at 3-4.) Martin was expected to testify about the positioning of the shooter; in reference to the evaluation of the RPD, what the deposits of certain casings in the garage may mean from a forensics perspective; and his opinion about the location of the shooter at the time Bolanos was alleged to have fired several rounds into the victim's vehicle. (*Id.*)

The NSC determined Bolanos did not establish deficient performance or prejudice:

> [A]ppellant contends that trial counsel should have presented testimony from a ballistics expert who would have testified that based on appellant's height, bullet trajectories, and the apparent inexperience of the shooter, appellant could not have been the shooter. Appellant failed to demonstrate deficient performance. The State alleged that appellant fired at a moving vehicle and then the occupants as they ran away. The defense attempted to develop reasonable doubt by pointing to the absence of a weapon linking appellant to the crime, particularly arguing that there was no way to confirm that the rifle in appellant's photos was the same caliber as the weapon used in the crime or even an actual firearm. These arguments would be undermined by any assertion that appellant was a more experienced shooter. Moreover, given the aforementioned evidence of guilt, appellant did not demonstrate a reasonable probability of a different result at trial had counsel introduced this expert testimony. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

(ECF No. 56-29 at 6-7.)

The NSC's determination that Bolanos failed to establish deficient performance or prejudice under *Strickland* is objectively reasonable. As stated above, defense counsel informed the court of the decision not to call Martini "based on a number of things" that had nothing to do with the court's timing. Moreover, Bolanos has not demonstrated a reasonable probability that, but for counsel's failure to present Martini's testimony, there is a reasonable probability the result of the trial would have been different. The State's ballistics evidence did not identify the height of the shooter or the shooter's location inside the garage. The State did not present evidence of Bolanos's fingerprints or DNA on any of the ballistics evidence including casings and bullet fragments from the scene, or firearm-related items inside the red BMW. Bolanos alleges the State's forensic scientist was unable to pinpoint the location or identify with certainty the location of casings or the

type of firearm that was used. He alleges that Martini was expected to testify that, due to Bolanos's height, the angles in the garage, trajectory of the bullets, and inexperience of the shooter, Bolanos could not have been the shooter. Nothing in the state court record demonstrates that Martini would have provided such testimony. And Bolanos provided nothing that establishes a forensic expert could opine, from casings at the scene, which can be easily moved, that Bolanos could not have been the shooter.

Accordingly, the NSC's determinations are neither contrary to nor constitute an unreasonable application of *Strickland*'s performance and prejudice prongs and are not based on an unreasonable determination of fact considering the evidence presented during the state court proceedings. Ground 11(B) is denied.

### L.     Ground 12—IAC—Failure to Request Instruction on Loss of Evidence

Bolanos alleges he received ineffective assistance of trial counsel for failing to request a jury instruction regarding loss or destruction of gunshot residue ("GSR") evidence and ineffective assistance of appellate counsel for failing to raise the issue of the State's failure to preserve the GSR evidence. (ECF No. 28 at 40-42.)

#### 1.     Additional Background

The shooting occurred around 3:15 a.m. (ECF No. 41-1 at 88.) At 5:49 a.m., about 2.5 hours after his initial contact with police, Bolanos was questioned by Ferguson at the police station. (ECF No. 40-2 at 48.) At that time, Bolanos was considered a victim. (*Id.* at 52.) At 7:56 a.m., Ferguson's started a second part of his interview of Bolanos, during which he still considered Bolanos a victim. (*Id.* at 57-59.) The third part of the interview started around noon and, although Ferguson had by then obtained a seizure order for Bolanos's DNA, he still considered Bolanos a victim, and told Bolanos he was not under arrest and free to leave after he provided the samples. (*Id.* at 62-68.) Bolanos's hands were swabbed during the DNA retrieval. (ECF No. 36-5 at 67-69.)

Before trial, the parties executed a stipulation and order for the exchange of pretrial discovery in which, among other things, Bolanos requested discovery of "[r]esults or reports of . . . scientific tests . . . made in connection with the particular case . . ." and the

State agreed to provide Bolanos with all exculpatory materials. (ECF No. 33-12 at 3.)

On July 2, 2012, Bolanos emailed the State requesting the status of the gunshot residue test results, stating: "[A]s we previously discussed, we were awaiting the results of the gunshot residue test that was performed upon Mr. Bolanos. Unfortunately, those results have not been available and therefore, I wanted to ask again as to what you thought the timeframe may be," and "I will be in touch with you in the near future but am hopeful that you might be able to advise as to the location of the video and potentially the gunshot residue test results." (ECF No. 33-23 at 12.) On July 12, 2012, defense counsel again emailed the State concerning the GSR test, stating "[m]y client is adamant he was tested for GSR, and I have advised him we still do not have the results." (*Id.* at 14.) At a subsequent pretrial hearing on January 25, 2013, Detective Ferguson testified Bolanos's hands were swabbed but no GSR test was performed:

Q    Now, at some point during Mr. Bolanos' visit with the RPD, his hands are swabbed; right?

A    Yes, sir.

Q    They're swabbed for what is called "gunshot residue"; true?

A    Correct.

Q    Apparently, RPD then chose not to test the swabs; right?

A    We have not tested those; right.

Q    So you've got no swabs to indicate that he fired a firearm that evening; true?

A    Correct.

Q    You took his clothing; did you not?

A    Yes, sir.

Q    Have you tested his clothing for any sort of nitrates?

A    No, sir.

. . . .

Q    What did you test beyond his hands? Anything?

A    No, sir.

1    (ECF No. 34-1 at 65-67.)

2         At trial, the forensic investigator testified that GSR swabs were collected from

3    Bolanos around 12:30 p.m. on the day of the shooting. (ECF No. 44-1 at 58, 61.) The

4    criminalist testified "laboratories may establish criteria where they will not analyze

5    samples that can be as short as two hours or as long as 12 hours," and his lab does not

6    conduct GSR testing for samples collected more than six hours after the event. (*Id.* at

7    119-22, 125-26.) The criminalist explained the six-hour limit applies to individuals who

8    move about freely after the event. (*Id.*) Based on research papers, in-house studies, his

9    training, and information imparted at trial, the criminalist recommended against testing

10   samples taken eight to nine hours after the event "as they would not be probative." (*Id.*)

### 2.    Standards for Evaluating Preservation of Evidence

12        In *California v. Trombetta*, 467 U.S. 479 (1984), the Supreme Court considered

13   whether Due Process under the Fourteenth Amendment "demands that the State

14   preserve potentially exculpatory evidence on behalf of defendants," in particular, "whether

15   the Due Process Clause requires law enforcement agencies to preserve breath samples

16   of suspected drunken drivers in order for the results of breath-analysis tests to be

17   admissible in criminal prosecutions." *Id.* at 481.  The Court concluded the failure to

18   preserve breath samples did not violate Due Process because officers did not destroy the

19   samples "in a calculated effort to circumvent the disclosure requirements established

20   by" *Brady*; rather, they acted "'in good faith and in accord with their normal practices . .

21   ..'" *Id.* at 487 (quoting *Killian v. United States*, 368 U.S. 231 (1961)). The Supreme Court

22   stated, "[w]hatever duty the Constitution imposes on the States to preserve evidence, that

23   duty must be limited to evidence that might be expected to play a significant role in the

24   suspect's defense." *Id.* at 488. The Supreme Court went on to state, "[t]o meet this

25   standard of constitutional materiality . . . evidence must both possess an exculpatory

26   value that was apparent before the evidence was destroyed, and be of such a nature that

27   the defendant would be unable to obtain comparable evidence by other reasonably

28   available means." *Id.* at 489 (internal citation omitted).

In *Arizona v. Youngblood*, 488 U.S. 51 (1988), the Supreme Court granted certiorari to consider "the extent to which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that might be useful to a criminal defendant." *Id.* at. 52. The Court held that "[u]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *Id.* at 56 n.* (citing *Napue*, 360 U.S. at 269).

"Potentially useful evidence, as defined in *Youngblood*, is 'evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.'" *United States v. Zaragoza-Moreira*, 780 F.3d 971, 978 (9th Cir. 2015) (quoting *Youngblood*, 488 U.S. at 57). The Supreme Court has not held the existence of a pending discovery request eliminates the necessity of showing bad faith on the part of the police. *See Illinois v. Fisher*, 540 U.S. 544, 548 (2004).

### 3.    NSC's Determination

In state postconviction proceedings, the NSC determined Bolanos failed to establish he was prejudiced by counsel's failure to request an instruction that it is presumed there was no GSR on Bolanos's hands as a sanction for having destroyed the swabs:

> [A]ppellant alleged that trial counsel should have obtained a jury instruction concerning the loss of gunshot residue evidence, which the State collected, but did not test.
>
> > [FN 1] Appellant was aware that no testing or results were generated at the time of trial.
>
> Appellant failed to demonstrate prejudice. A defendant may be entitled to an instruction that lost or destroyed evidence was favorable to the accused when it is shown that the loss of the evidence amounted to a due process violation. *State v. Daniel,* 119 Nev. 498, 521, 78 P.3d 890, 905 (2003); *Sanborn v. State,* 107 Nev. 399, 408, 812 P.2d 1279, 1286 (1991). At trial,

1
2
3
4

the State's expert conceded that testing of the swabs would not have shown the presence of any residue due to the length of time between the shooting and the swab collection. Given this concession, appellant did not demonstrate a reasonable likelihood of a different result at trial had the jury been similarly instructed. Therefore, the district court did not err in denying this claim without conducting an evidentiary hearing.

5

(ECF No. 56-29 at 7.)

6

### 4.    Analysis of Ground 12

7

Bolanos has not demonstrated the State failed to preserve the GSR swabs. *See*

8

ECF No. 55-22 at 34-35, 38-39, 41-43. The allegation the State signaled the swabs were

9

not preserved because they did not test them is insufficient to establish they were lost or

10

destroyed, and the defense had no access to them. The State's expert gave reasons for

11

not testing the swabs but did not state the swabs were destroyed. He confirmed he did

12

not recommend testing samples taken eight or nine hours after the event "as they would

13

not be probative," under the circumstances involved in this case.[15] Thus, it was

14

reasonable for the NSC to conclude that, but for counsel's failure to request an instruction

15

concerning loss of GSR evidence or raise the issue on appeal, there is no reasonable

16

probability an instruction would have been given or a reasonable probability that the result

17

of the trial or appeal would have been different. Ground 12 is denied.

18

### M.    Ground 13—Cumulative Errors

19

Bolanos alleges the cumulative effect of errors on the part of the trial court and trial

20

counsel violated his rights to due process and a fair trial under the Fifth, Sixth, Eighth,

21

and Fourteenth Amendments. (ECF No. 28 at 42-43.)

22

"[T]he combined effect of multiple trial court errors violates due process where it

23

renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922,

24

927 (9th Cir. 2007). "The cumulative effect of multiple errors can violate due process even

25

26
27
28

[15]Although Ferguson agreed with the prosecutor that he did not have swabs indicating Bolanos fired a firearm on the night of the shooting, that question and response were made in the context of Ferguson's testimony that no GSR test was conducted and does not unambiguously indicate the State destroyed the swabs. *See supra*.

where no single error rises to the level of a constitutional violation or would independently warrant reversal." *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973).

### 1.    Ground 13(A)—Direct Appeal[16]

The NSC rejected the cumulative error claim on direct appeal: "Appellant contends that cumulative error entitles him to relief. Considering the relevant factors, *see Valdez v. State*, 196 P.3d 465, 481 (2008), we conclude that no relief is warranted." (ECF No. 53-11 at 7.) The Court finds the NSC's determination objectively reasonable. On direct appeal, the NSC concluded the trial court committe harmless error when it permitted the State to read John's testimony and admitted evidence of Bolanos's statements to the police. *See* Grounds 3 and 4. The combined errors did not result in a fundamentally unfair trial. As discussed above, John's testimony was to some extent exculpatory and Bolanos did not confess to police. Ground 13(A) is denied as the cumulative effect of the errors does not warrant reversal.

### 2.    Ground 13(B)—Postconviction Proceedings

Although IAC claims are examined separately to determine whether counsel was deficient, the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 689, 691-92. The performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances. See id.* (emphasis added); *see also Boyde*, 404 F.3d at 1176 ("Prejudice may result from the cumulative impact of multiple deficiencies.") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)). The Ninth Circuit Court of Appeals has held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct *as a whole* to determine

---

[16]For clarity, the Court subdivides the cumulative error claims.

1  whether it was constitutionally adequate." *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir.

2  2017) (emphasis in original) (quoting in part *Strickland*, 466 U.S. at 690).

3      The NSC rejected the cumulative error claim raised in state postconviction review:

4        [A]ppellant argues that the cumulative effect of counsel and trial court

5  errors denied him due process. Even assuming that multiple instances of
    deficient performance may be cumulated for purposes of showing prejudice,

6  *see McConnell v. State,* 125 Nev. 243, 259 n.17, 212 P.3d 307, 318 n.17
    (2009), appellant only demonstrated one instance of arguable deficient

7  performance, which itself was not prejudicial.

8  (ECF No. 56-29 at 8.)

9      On consideration of the merits of Bolanos's IAC claims, including his trial and

10  appellate counsel claims, the Court concludes he does not show that, overall, trial

11  counsel's actions or omissions were deficient and prejudicial. Thus, Bolanos has not

12  demonstrated constitutionally inadequate assistance of trial counsel that denied him due

13  process or a fair trial.

14  **V.    CERTIFICATE OF APPEALABILITY**

15      This is a final order adverse to Bolanos. Rule 11 of the Rules Governing Section

16  2254 Cases requires the Court to issue or deny a COA. Therefore, the Court has *sua*

17  *sponte* evaluated the claims within the petition for suitability for the issuance of a COA.

18  *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Under

19  28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner has made "a

20  substantial showing of the denial of a constitutional right." With respect to claims rejected

21  on the merits, a petitioner "must demonstrate that reasonable jurists would find the district

22  court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*,

23  529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For

24  procedural rulings, a COA will issue only if reasonable jurists could debate: (1) whether

25  the petition states a valid claim of the denial of a constitutional right; and (2) whether this

26  Court's procedural ruling was correct. *See id.* Applying these standards, a COA is

27  warranted for Grounds 3, 4 and 13(A).

28  ///

1

## VI.    CONCLUSION

2    The Court notes the parties made arguments and cited cases not discussed above.

3    The Court reviewed these arguments and cases and determined they do not warrant

4    discussion as they do not affect the outcome of the issues before the Court.

5    It is therefore ordered that Petitioner's Second Amended Petition (ECF No. 28) is

6    denied.

7    It is further ordered that all requests for evidentiary hearings are denied.

8    It is further ordered that a Certificate of Appealability is granted for Grounds 3, 4

9    and 13(A) and denied as to all other grounds of the Petition.

10    It is further ordered that the Clerk of Court is directed to: (1) substitute Nathanjah

11    Breitenbach for respondent Tim Garrett; and (2) enter judgment accordingly and close

12    this case.

13    DATED THIS 24th Day of June 2025.

14

15    _____

16    MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28